UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6270-CR-GRAHAM

UNITED STATES OF AMERICA,
          Plaintiff,

v.

HANNIBAL PENNEY,
          Defendant.
_____/

### DEFENDANT HANNIBAL PENNEY'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS SECOND MOTION IN LIMINIE, TO SUPPRESS ILLEGAL WIRE INTERCEPTIONS AND THIER FRUITS

The government has filed a response to Hannibal Penney's motion to suppress the illegal wire interceptions by codefendant Ed Hexter[1] that takes a complex area of the law and makes it confusing. By this reply, Mr. Penney will attempt to unravel the government's reply and demonstrate why established law requires that his motion be granted.

The point of beginning is "the statutory exclusionary rule," Title 18, United States Code, Section 2515: "Whenever any wire or oral communication has been intercepted, no

---

[1] The government claims that Mr. Penney's motion makes "inaccurate references to other tapes in this case" and proceeds to clear up an "inaccuracy" that was neither express nor implied in Mr. Penney's motion. So that the court is not sidetracked by this tempest, Mr. Penney would like to make clear that the "verification" tapes, which were in fact done in the open, so that everyone knew about them, and which were recorded by the verifier herself as a party to the conversation after she obtained consent from the customer to record, were done in compliance with both Florida and Federal law. They are not subject to this motion to suppress. Ed Hexter's surreptitious recording of Mr. Penney's calls, of course of conduct of relatively short duration (starting in about January 1996 until the July 1996 shut-down of Best Marketing, Inc.) was in violation of the law and these tapes are the subject to Mr. Penney's motion to suppress.



part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial . . .."

The government makes three arguments as to why Hexter's tapes should not be suppressed. They argue, first, that Hexter's eavesdropping was not an intercept under the "business record exception," second, that Mr. Penney consented to the recordings and, third, that the government should be able to benefit from Hexter's illegality under a "clean hands" doctrine. Mr. Penney addresses these arguments in reverse order.

**A. "Clean hands" is almost universally rejected by the courts in the Title III context and this court should not adopt the doctrine.**

Mr. Penney took considerable care to research and to present to the court in his motion the state of the law among the several circuits regarding the "clean hands" doctrine, that is the concept that if the government had no affirmative role in the illegality of the procurement of evidence, then the government should be allowed to use the evidence in a criminal prosecution. Mr. Penney took this care because the Eleventh Circuit Court of Appeals has not ruled on the issue and because, with the publication by the Sixth Circuit Court of Appeals of *United States v. Murdock*, 63 F.3d 1391 (6th Cir.1995), there actually was a split of authority on the question of the applicability of the clean hands doctrine to illegal wiretaps. Mr. Penney's research supports the conclusion that *Murdock* has been tacitly abandoned by the Sixth Circuit and, as other circuits address the issue, they adopt the rule of *United States v. Vest*, 813 F.2d 477 (1st Cir. 1987), that rejects the "clean hands" concept. *See, In re Grand Jury*, 111 F.3d 1066 (3rd Cir.1997).

The government's response quotes the conclusion of *Murdock* without any discussion of exactly what it is that they are asking this court to do, that is, to buy into an argument that the government has routinely made in other courts and has been routinely rejected.

The government goes beyond lack of candid legal scholarship. The government, unfortunately, raises four sequential arguments in this section of their memorandum that are classic red herrings, whose only purpose it to deflect the hounds from the scent of their quarry.

The government starts this section of its memorandum with the proposition that despite broad wording, provisions of Title III have limits on their application. They cite *Bartnicki v. Vopper*, 121 S.Ct. 1753 (2001), as limiting the reach of the criminal sanctions of 18 U.S.C. § 2511(1)(c). Mr. Penney has not asked to have anyone criminally prosecuted. He simply wants unlawfully obtained evidence to be suppressed.

Citing *United States v. Malekzadeh*, 855 F.2d 1492 (11th Cir.1988), the government next tells the court "In spite of the broad language in the exclusionary clause of Title III, the Eleventh Circuit has applied the good faith exception to Title II." This is true, but the argument is somewhat duplicitous because it has absolutely nothing to do with the clean hands doctrine. The case involved a court-ordered wiretap. In *Malekzadeh*, the Eleventh Circuit recognized, and in fact anticipated Congressional amendment of Title III to incorporate, the holding of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), as having application to a court ordered wiretap. The ruling, and now the statute itself, simply says that if the officers act in good faith, a

3

technical defect will not defeat the efficacy of the court's authorization of electronic interception.

In the next paragraph, the government tells the court that "evidence may be used in judicial proceedings for impeachment purposes for the end of preserving truth." Again, this is a point that simply has nothing to do with the issues brought before the court by Mr. Penney's motion. *Forsyth v. Barr*, 19 F.3d 1527 (5th Cir. 1994), the case cited for this proposition in the government's memorandum, was a civil claim against a municipality and three police officers arising from their acquisition of a taped conversation about a drug deal. This case has relevance to Mr. Penney's issues, but not in the way it is used by the government. *Forsyth v. Barr* concluded that the illegal tape was not "used" in a way that implicated Section 2515 because it was used only in an internal police investigation, not as evidence at trial. The government here proposes to use illegally recorded tapes as evidence in its case in chief, which is prohibited by Section 2515.

The fourth strawman erected by the government in this section of its memorandum is the statement that "in *Forsyth* the court rejected the contention that illegally intercepted information cannot be used for any purpose whatsoever, noting among other things that section 2515 was poorly drafted." Mr. Penney has not claimed that there is no purpose whatsoever for which these illegal tapes can be used, and he has no pertinent opinion about the quality of the legislative drafting.

Mr. Penney simply asks the court to enforce Section 2515 as Congress chose to write it, and to suppress the Hexter tapes and their fruits.

**B. The government asks this court to infer Mr. Penney's consent to the wiretap, but withholds from the court evidence the government has that shows there could be no consent.**

The government cites *Watkins v. L.M. Berry & Company*, 704 F.2d 577 (11th Cir.1983), as standing for the proposition that "the scope of consent can be implied from the facts of each case." What the court wrote in *Berry* is a bit different from the way the government characterized it. *Berry* teaches: "Consent under Title III in not to be cavalierly implied." Id. at 581.

Beyond this, the government fails to disclose to the court a significant item of information about Hexter's tape recordings that make it extremely improbable that Mr. Penney would have known that tape recordings were going on.

The government tells the court that codefendant Mark Goldberg told Roby Dudley that Ed Hexter was recording his calls. Presumably the government knows this because Goldberg is cooperating with the government,[2] although this fact is not mentioned in any of the several reports memorializing Goldberg's lengthy debriefings.

The government has no direct evidence that Mr. Penney knew that Ed Hexter was recording his calls. Lacking evidence, they make broad allegations in their memorandum, without support, to the effect that "everybody knew"[3] and since everybody knew, Mr. Penney probably knew. What the government leaves out it direct evidence in

---

[2] This is one of those cases where the government has made sweetheart deals with the chiefs in exchange for testimony against the Indians.
[3] Page 3: "[I]t was common practice for owners and supervisors to monitor the salespeople's phone conversations. This was done at American, at Datron, and at Best. It was common knowledge."
 Page 3: "The word got around the salespersons about the recording."

their possession that supports Mr. Penney's allegation that he did not know what Hexter was doing. The FBI 302 memorializing Goldberg's debriefing states: "GOLDBERG advised that ED HEXTER, the owner of BMI, did not trust the DATRON salespeople. HEXTER began recording the sales calls made by the salespeople in approximately 1996. HEXTER made it known that he felt the DATRON salespeople were loyal to their former company and may steal customers and business from BMI." It is unlikely in the extreme that Mr. Penney would have learned inadvertently of a taping program that was instituted by Ed Hexter because Hexter did not trust Mr. Penney. Also, this explanation for why Hexter suddenly started the taping regimen after a decade of business in which such calls were not taped puts the lie to the government's argument that this was done in the ordinary course of business.

In light of this failure to disclose such significant evidence, the government's urging that the court infer consent by Mr. Penney may not be "shocking," but it sure is close to that.

**C. The "business extension exception" had been developed and applied by the Eleventh Circuit as a defense in civil claims by employees against legitimate companies, but has no application in criminal cases.**

The government in this case attempts to forge into a sword for criminal prosecution a shield created by Congress for lawful businesses legitimately engaged in intercepting selected calls to or from their employees.

To this end, the government has collected the series of civil damages cases in which the Eleventh Circuit Court of Appeals has fashioned an interpretation of 18 U.S.C. § 2510(4) and (5), to protect legal businesses with a legitimate reason to tape-record

6

employee conversations. The government then lines these cases in a row and asks the court to take a step to a place beyond where the Eleventh Circuit has ever gone, and apply this civil rule of law to sanitize tapes illegally made in an illegal enterprise by an indicted codefendant who died before his plea agreement could be accepted by the court.

The government does not mention in its memorandum, and may not have considered, the fact that the cases they cite do not involve the use of wire or oral communications in trial and, consequently, do not implicated the statutory exclusionary rule of Section 2515. Instead, these cases involve a judicially fashioned defense to a civil damage claim by an "aggrieved person."

It is worth a moment's pause to acknowledge that the Eleventh Circuit's interpretation of the statute is more friendly to business that the general jurisprudence. Mr. Penney takes the government's bizarre footnote #2, "In specific cases in the Title III area in general, however, the courts of appeals from the various federal circuits differ on a number of issues," to be an oblique acknowledgement of this fact. The Eleventh Circuit has adopted the rule that it is the telephone extension that does the intercept, not the tape recorder that the business owner has attached to the telephone. Other circuits disagree. This, however, is a digression.

The point is that this rule for civil damage cases has never been applied to overcome the statutory exclusionary rule of Section 2515 to permit the use of such evidence in criminal prosecutions. None of the cases cited by the government stand for this proposition and counsel for Mr. Penney has found none.

Again, a moment's thought will suggest the reason for this fundamental dichotomy in the law between a shield in a civil case and a sword in a criminal case.

7

The cases cited by the government involve legal businesses, with legitimate reasons to record their employees and clear policies regulating their interception of employee calls. In *Royal Health Care Services, Inc. v. Jefferson-Pilot Life Ins.*, 924 F.2d 215 (11th Cir.1991), a life insurance company recorded all telephone calls going out "from its case management department (which is responsible for ensuring that services to JP Life's insured are rendered in a cost-effective manner)." The recording devise used by the life insurance company issued a "beep" audible to anyone on the line. In *Epps v. St. Mary's Hosp. of Athens*, 802 F.2d 412 (11th Cir.1986), calls routed to the emergency medical technicians were recorded. "Calls coming into or going out from the dispatch console are automatically recorded on a large, double-reeled tape recorder." Id., at 413. *Watkins v. L.M. Berry & Company*, 704 F.2d 577 (11th Cir.1983), is the seminal case in the Eleventh Circuit on the business extension exception. The L.M. Berry & Company was engaged in soliciting yellow page adds for the telephone company. The company "had an established policy, of which all employees are informed, of monitoring solicitation calls as part of its regular training program." Id., at 579. In each of these cases there was clear and clearly legitimate business reason for the intercept. In addition, it was a clearly understood company policy that such intercepts would be made and were being made.

This is not true about Hexter's eavesdropping.

Judge Kravitch wrote an opinion concurring in part and dissenting in part in the *St. Mary's Hospital* case, 802 F.2d at 417. His thoughts capture why the government's attempt to use a civil defense exception to get Ed Hexter's eavesdropping into a criminal case is an attempt to put a square peg into a round hole.

8

Judge Kravitch wrote: "Case law suggests that Smith's eavesdropping was not the sort of activity Congress intended to immunize." Certainly the government, which has taken the care in their pleading to give the court "Background" showing Hannibal Penney and the others at Best Marketing, Inc., to be despicable people, does not suggest that the ringleader of this criminal band was the sort of person, or that his eavesdropping on his co conspirators was the sort of activity Congress intended to protect.

Judge Kravitch wrote: "[T]he eavesdropper must have a legitimate business purpose and authorization to intrude on employee privacy." Once the prosecutor calms herself from her zeal in defending her rights to use Hexter's tapes, the defense truly doubts that she will concede that Hexter had a legitimate business purpose. He certainly was not a life insurance company protecting the premiums of subscribers. He certainly was not a hospital protecting the accuracy of information and the promptness of response of emergency medical technicians. He certainly was not an advertising company charged with faithful collection of advertisers for the telephone company's yellow pages. What authorization he had to eavesdrop on Hannibal Penney's calls, other than that authority he usurped as a criminal kingpin, is an utter mystery.

Judge Kravitch wrote: "[T]he monitoring must advance a legitimate business purpose." Perhaps the government would care to tell the court what that legitimate business purpose was. It certainly does not show up in their "Background."

The prosecutor has artfully aligned these civil cases in a row pointing at the conclusion they urge the court to adopt, but there simply is not any relevant precedent that takes this criminal case beyond suppression of Hexter's tapes and their fruits.

## Conclusion[4]

For the foregoing reasons, defendant Hannibal Penney request that the Hexter tapes be suppressed.

Respectfully submitted,

*William M. Norris* (signature)

William M. Norris
7685 S.W. 104th Street, Suite 220
Miami, FL 33156
Florida Bar No. 0309990
Attorney for Hannibal Penney

---

[4] The government has made the claim in footnote No. 1 of their memorandum that "Based on the papers alone, the defendants have not met their preliminary burden of establishing standing to move to suppress specific tapes." Defense counsel views this as something of a throw down argument, and really rather silly because Mr. Penney's motion did not spring into existence in a vacuum, like Athena from Zeus' forehead. "Based on the papers alone" is nothing more than a construct, and is a condition contrary to fact. However, defense counsel has learned the hard way not to ignore silly arguments by prosecutors.
  1. The government has provided counsel with hundreds of pages of transcript that identify the speaker as Hannibal Penney, using a name under which he did business. Indeed, counsel has multiple editions of transcripts showing Mr. Penney to be the speaker in one or more telephone conversations for each substantive count in the indictment.
  2. Counsel has asked the prosecutor on at least two occasions how she intents to authenticate Hannibal Penney's voice on the tape, since he was using a business name and the customer had never met him. The prosecutor has assured counsel that she will be able to do this at trial.
  3. Counsel wrote a letter to the prosecutor on December 27, 2001, presenting a claim on behalf of Hannibal Penney as a party aggrieved pursuant to 18 U.S.C. § 3504 and asking that the prosecutor affirm or deny the occurrence of the alleged unlawful act as required by that statute. The prosecutor has not, for whatever reason, responded to this claim by Mr. Penney, but she has a statutory obligation to do so nonetheless.
  4. The case law cited by the government is not on point. The cases address situations in which the complaining party asserts that he was intercepted on a court authorized wiretap, but was not a named target of the wire. In context, those cases make sense to restrict pointless litigation. This case involves an effort to limit the government's use at trial of tapes they claim is the defendant. To now claim that Mr. Penney's motion should be viewed "on the papers alone" or to claim that he somehow has to do more than he has, simply is silly.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFIY that a true and correct copy of the forgoing reply was mailed postage prepaid this 31st day of January, 2002 to: AUSA Ana Maria Martinez, 55 NE 4th Street, Miami, Fl 33132 and Albert Levin, Esquire, 888 Brickell Avenue, Fl 6, Miami, Fl 33131.

_____
William M. Norris