UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6270-CR-GRAHAM

FILED BY _____ D.C.

02 JUL 26 PM 3:03

CLARENCE HADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA - MIA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

HANNIBAL PENNEY,

        Defendant.
_____/

## DEFENDANT HANNIBAL PENNEY'S OBJECTIONS TO THE PRESENTENCE REPORT

Defendant Hannibal Penney objects to the Presentence Report. It is a marginally edited rehash of presentence reports prepared for other defendants based on pre-trial pleas and represents exclusively the government's theory based on the government's investigation. Mr. Penney and other defendant, Roby Dudley, went to trial. As a result of that trial, the jury repudiated the essence of the government's theory of the case. The presentence report barely acknowledges that there was a trial. It certainly does not reflect the verdict.

**I. The Offense Conduct:**

The offense conduct section of the presentence report acknowledges, in ¶ 3, that it was drawn "from investigative reports provided by Assistant United States Attorney Ana Maria Martinez." This may well be the best, and often the only, source of information for the probation officer in the instance of a pre-trial plea which accepts the validity of the government's theory of the case. In this instance, this exclusive reliance on the

1



government's pretrial investigation does nothing to help the court in the sentencing phase of this case and does the defendant the affirmative disservice of creating a document which the Bureau of Prisons will treat as distilled truth about Mr. Penney. For example, ¶8 talks of reports by a confidential informant, who did not testify at Mr. Penney's trial; ¶11 talks of an interview of Sydell Salzman, who did not testify at Mr. Penney's trail; and ¶12 talks of an interview of Ruth Geier, who did not testify at Mr. Penney's trial. In fact, the only trial witness who provided information used in the presentence report is Mark Goldberg. Two paragraphs in the presentence report, ¶9 and ¶10, refer to Mr. Goldberg's pretrial interviews. Interestingly, Mr. Penney is not mentioned in these paragraphs at all.

The court is fully aware that there was a three week trial complete with cross-examination and defense witnesses that convinced the jury that the government could not prove the case contained in the presentence report.

Since Mr. Penney was found not guilty of conspiracy, and convicted only of six specific transactions, he asks the court to strike those portions of the "Offense Conduct" section of the presentence report that to not specifically refer to either the conduct of Mr. Penney or the six transactions for which he is to be sentenced.

**II. Role Assessment:**

Information about Mr. Penny is contained in ¶18. The PSR incorrectly states that Mr. Penney worked for BMI during 1995. It also characterizes Mr. Penney as a "top" reloader, without discussion of what criteria make one a "top" reloader and without discussion as to why reloader status has any bearing on the role assessment calculus. It also states that Mr. Penney is "responsible" for a loss of "more than $1,500,000 but not more than $2,500,000, which is based on a 30% reduction for the value of the awards

given." Where this number comes from is a mystery. It certainly has nothing to do with Mr. Penney's sentencing calculus. Unfortunately, the PSR has no section containing a discussion of loss attributable to the defendant, so it is impossible for Mr. Penney to "respond" to the way the probation officer came up with this number.

As to "Role Assessment," Mr. Penney objects to the conclusion in ¶28 that there should be no adjustment for role in the offense.

In ¶14, the probation officer correctly identifies Edward Hexter as most culpable. Ed Hexter, however, is simply the top of the pyramnid. The trial testimony established that there were tiers of responsibility below him. There was a management tier of which the probation offiecer is apparently unaware. Mark Goldberg was a manager and in fact was paid a management bonus independent of his sales-based commission. There was a front-room manager in Ruth Geir, a confirmations manager in Barbara Kelley and an office manager in David Hexter. Historically, as reflected in the government's pretrial investigation and ¶9 of the PSR, there was a management team that included Richgard Stockton and Paul Oppenheimer. In fairness, these people would have to be considered more culpable than Hannibal Penney[1].

The trial testimony, which is not reflected in the PSR, established that there was an

---

[1] Mr. Penney does not seek to rain on anyone else's parade, but it is difficult to see how Mr. Penney could be put at the same level of culpability as Mr. Goldberg, who also awaits sentencing by this court. The trial revealed that Mr. Goldberg was a supervisor/manager at BMI who had been moved with a sub-unit to a different location in anticipation of a business expansion by BMI. Goldberg sold $6.5 million worth of advertising specialty items for BMI over a seven year period of employment. Hannibal Penney managed no one. He worked for BMI for less than six months and made about $30,000. These facts do not support the conclusion that Goldberg and Penney occupied the same level of responsibility.

inner circle at Best Marketing. All of the others indicted in this case were part of that inner circle. Mr. Penney was not in the inner circle; he was not one of the "Best Boys."

While the government clearly has discretion as to who to indict and who not to indict, the fact that they chose not to indict the management tier of people at Best Marketing should not be allowed to alter reality for purposes of sentencing. Reality is that Hannibal Penney was subordinate to, managed by and subject to instruction from other people at Best Marketing. He should have a lower rung in the sentencing ladder that reflects this reality. Mr. Penney submits that pursuant to United States Sentencing Commission Guidelines Manual Section 3.B1.2(b) he is entitled to a mitigating role adjustment of a decrease of two levels by reason of being a minor participant in the criminal activity.

### III. Fraud Loss Computation:

The presentence report contains no discussion at all of the most important issue for sentencing, that is the amount of fraud loss to be attributed to Mr. Penney. In ¶18, under the heading of role assessment, the PSR states that Mr. Penney is "responsible for a loss of more than $1,500,00 but not more than $2,500,00." Where this number comes from, again, is not disclosed.

Mr. Penney submits that the fraud loss for which he should be assessed is no more than 70% the gross sales involved in the six counts of conviction. Total sales in those counts was $5,494. The probation officer uses a 30% discount for the cost of premiums. Mr. Penney believes other discounts are appropriate, but must retrieve the necessary data to perform this accounting. In any event, applying the probation officer's discount to the gross sales produces a fraud loss of $3,845.80, resulting in an increase in the base offense

4

level of +1 under SCGM § 2F.1.1(b)(1)(B). .

### IV. More than Minimal Planning:

In ¶26 of the PSR, the probation officer assigns an increase of two levels under SCGM § 2F.1.1(b)(2)(A). The PSR contains no discussion of why this enhancement is appropriate. Mr. Penney challenges this increase.

### V. Criminal History:

The probation officer has assigned two criminal history points to Mr. Penney for a driving under the influence conviction in Los Angeles, California on January 23, 2001. As witness testimony during trial established, Mr. Penney does not drink. The PSR does show that he takes hypertension medication. As a consequence of a letter regarding the effects of this medication from Mr. Renney's doctor, the presiding judge imposed an alternative sentence sentence. This fact is shown in the narrative of the PSR, but the probation officer has not acknowledged the consequence of this disposition under the Application Notes to SCGM § 4A1.2. Application note 4 states: " A sentence which specifies a fine or other non-incarcerative disposition as an alternative to a term of imprisonment (e.g., $1,000 fine or ninety days' imprisonment) is treated as a non-imprisonment sentence."

Lest ¶40 (Other Arrests) raise concern about Mr. Penney's propensity for violence, the court should be aware that his arrest on March 29, 1977, in New Haven, Connecticut, for carrying a dangerous weapon shows that even in the liberal environs of Yale University, being black with a pony-tail can have consequences. The dangerous weapon was a pocket-knife. The charge was nol prossed.

## VI. Proposed Sentence Computation:

| | |
|---|---|
| Base offense level: | 6 |
| Specific offense characteristic: | +1 |
| Role adjustment: | <u>-2</u> |
| Total Offense Level: | 5 |

With a total offense level 5 and a criminal history category of I, Mr. Penney's presumptive sentencing range is 0-6 months. He is eligible for probation.

## VII. Restitution and Fine:

The PSR states, in ¶19, that the Mandatory Victims Restitution Act of 1996 apples to this offense. The effective date of that statute is after the date of the offense of conviction.

The probation officer's editorial comments suggest that she is irritated with Mr. Penney's responsiveness to her inquiries, notwithstanding the fact that Mr. Penney signed all of the disclosure authorization forms presented by the probation officer. Her comments include: ¶46, "The defendqant failed to provide this information during his initial interview." Mr. Penney was asked about his marital status. He was never asked about prior divorce. ¶56, "The defendant has refused to return any telephone calls from the probation officer regarding his current employment stuts and souce of income." This is a curious statement, because the PSR has a complete statement, from Mr. Penney, regarding his employment since the summer of 1967 when Best Marketing was shut down, and the PSR reports information obtained by the probation officer ["when questioned later"] from Mr. Penney. ¶60, "Although not mentioned by the defendant during the initial interview . . . he was employed with BMI as a reloader from 1995 to 1996." Mr. Penney

6

has never been employed as a reloader. That is the prosecution's plejorative term. He was not employed with BMI in any capacity in 1995. Finally, Mr. Penney went to see the probation officer specifically because he had been employed by Best Marketing in 1996. To suggest, as the probation officer seems to suggest, that Mr. Penney withheld this fact is simply stunning.

The probation offier goes beyond simple discontent with Mr. Penney's responsiveness. She seeks to penalize him for it. In ¶69, she says "The defendant has not demostrated (sic) his inability to pay a fine and, therefore, a fine should be imposed in this case." In ¶66, the PSR lists $581,029 in debt being carried by Mr. Penney. This debt exceeds Mr. Penney's ability to carry, as shown by the fact that Capital One Bank obtained a judgment of $11,108 against him.

Mr.Penney simply is too large a man to live in a mail-box. He has used the mail-box as his legal address for many years, and disclosed that fact to the court. In fact, he lives in a house. If this item of confusion is elimated, a fair reading of PSR ¶¶62-69 shows that Mr. Penney cannot afford a fine and that he cannot afford to pay restitution. His only asset is his home, which is owned with his wife in California, a community property state.

If the court has any question in this regard, Mr. Penney would request a hearing.

Respectfully submitted,

*William M. Norris*

William M. Norris
William M. Norris, P.A.
7685 S.W. 104 Street, Suite 220
Miami, Fl 33156

                        Tel. 305-661-6118
                        Fax. 305-667-6161
                        Attorney for Hannibal Penney

### Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed postage prepaid this 24th day of June, 2002; to:

| AUSA Anna Martinez | USPO Katrina R. Jenkins |
| 99 NE 4th Street | 300 NE 1st Ave, Rm 315 |
| Miami, FL 33132 | Miami, FL 33132 |

*William M. Norris*
William M. Norris