UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6270-CR-GRAHAM

UNITED STATES OF AMERICA

v.

HANNIBAL PENNEY
_____/

GOVERNMENT'S RESPONSE
TO DEFENDANT PENNEY'S OBJECTIONS TO THE PSI

The United States of America, by and through its undersigned Assistant United States Attorney, respectfully files this response to defendant Penney's objections to the PSI. For the reasons that follow, as well as further evidence and argument that may be presented at the sentencing hearing, the United States respectfully requests that the Court sentence Penney in accordance with the PSI.

**I. Objections relating to guideline calculations and restitution.[1]**

**A. Relevant conduct**

Without any reference to the applicable sentencing guidelines or case law, the defendant seeks to be sentenced only on the loss caused by the counts of conviction. The law and the facts of this case are contrary to his request.

---

[1] Without objection from the defendant, the PSI has been written based on the November, 1995 guideline book. The offenses charged in this case stopped on July 17, 1996, when the FBI executed a search warrant at Best Marketing, Inc. It appears that the 1995 book is more beneficial to the defendant. More recent guideline amendments would possibly result in higher guideline calculations (due to, for example, the enhancements now applicable to mass-marketing cases and the increases in offense levels applicable to certain loss amounts in fraud cases). The guidelines quoted here are from the 1995 book.

1

1. <u>The definition of "relevant conduct" for sentencing</u>

According to guideline sections 1B1.3(a)(1) and (a)(2) relevant conduct includes:

(A)   all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)   in the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, . . .

. . . "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. §1B1.3(a)(2).

2. <u>The relevant conduct in this case</u>

a. <u>A jointly undertaken criminal activity</u>

In this case, Penney and his codefendants were involved in a jointly undertaken criminal activity. The evidence showed that Penney and his codefendants, along with others, worked together to obtain money based on misrepresentations. This was not a one-man show, but rather a well orchestrated fraud scheme, in which the actions of the other participants were reasonably foreseeable to Penney.

The evidence showed that Penney worked at Best Marketing, Inc. as a telemarketing salesman from the beginning of 1996 to July 17, 1996, when the FBI executed a search warrant there. Best Marketing was a telemarketing operation which targeted small business owners from small towns throughout the United States. Best Marketing salesmen used lies to persuade the victims to make purchases of advertising items such as pens, mugs, key tags, ice scrapers, etc. Among other things, the salesmen misrepresented to the victims that they had a chance to win a valuable item (called a "premium"), such as a vehicle, a large amount of cash, etc. A letter that

2

was sent to confirm every sale told the victims that the "premium" would be selected randomly by a computer. This was completely false.

There was no random, computer selection. Each salesman would pre-select the premium that he intended to send to each victim depending on the dollar amount of the purchase the salesman was proposing. For each sale, the salesmen had to select a premium of a value low enough to allow for a significant profit for Ed Hexter, the owner of the company, and a commission for the salesman.

The salespeople who made the initial sales were called "fronters." The more experienced telemarketers would call the same customers again and again in order to "reload" them, that is, to make repeated sales of increasing dollar amounts. These salespeople were called "reloaders."

Penny, like his co-defendants Goldberg, Dudley, and Martin, was a "reloader." Penney's "leads" (customers who he would call) came from both Best Marketing and from Penney's own customer list from Datron, a similar telemarketing operation where Penney had worked prior to joining Best. At Best, Ed Hexter gave out lead sheets to the salesmen. These lead sheets included names that Hexter had bought from other companies, names of persons to whom the "fronters" at Best had been able to make an initial sale, or the names of customers who had previously bought from a reloader. Reloaders would call the same person over and over until the person stopped buying from that particular salesman. Even after a customer refused to buy from a reloader, that same reloader would call that same customer again pretending to be someone else by using a different name and a different voice. If that last tactic failed, then Hexter would "recycle" the lead by giving it to another reloader.

The reloaders at Best were provided with lists of the advertising specialty products and premiums that were available. The reloaders used secretaries to help them check the credit left on customers' credit cards, place calls, fill out order forms etc. Hexter paid for the cost of the secretaries as long as the reloader's sales reached a certain dollar amount each week.

After a sale was agreed to with a reloader, a "verifier" would speak with the customer. Sometimes the verifier would ask the reloader to speak to the customer again. When the oral verification was completed, Best sent out the confirmation letter falsely stating that the customer had a random, computer-selected chance to receive a valuable "premium." The reloaders, including Penney, frequently urged the customers to make everything go smoothly with the verification phone call and the confirmation letter. Once that letter was received by Best, other employees shipped the pre-selected premium along with the advertising items. When a victim complained, Ed Hexter's son, David Hexter, and Barbara Kelly, used the verification calls and confirmation letters to oppose charge backs to the customer's credit cards. Following an adamant protest by a customer, that customer's file was marked "RED," and finally no more calls were made to that victim.

      b. <u>Penney may be sentenced for the losses caused by Best Marketing</u>

The PSI is correct in determining that the relevant conduct attributable to Penney is between $1.5 and $2.5 million. Penney joined Best Marketing in January of 1996, and Best stopped its operations on July 17, 1996, when the FBI search warrant was executed. The total sales at Best during the time Penney was working there were approximately $2.4 million. Reducing that amount by approximately 30% (corresponding to the value of what was sent to the

4

customers), the total losses were approximately $1.7 million.[2] This was a jointly undertaken scheme to defraud, and in addition to Penney's own sales, the sales of the other participants were reasonably foreseeable to Penney.

Penney incorrectly urges this court to limit the relevant conduct to the losses caused by the specific sales involved in the wire fraud counts for which the jury found Penney guilty. Relevant conduct is not limited to charged or convicted conduct. Relevant conduct does not concern guilt proven to a jury beyond reasonable doubt. The court may consider as relevant conduct acts that were the basis of counts of which the defendant was acquitted, so long as that conduct has been proven by a preponderance of the evidence.[3] United States v. Watts, 519 U.S. 418 (1997); United States v. Rivera-Lopez, 928 F.2d 372 (11th Cir. 1991). In the same way, counts that have been dismissed as part of a plea agreement may be considered as relevant conduct. United States v. Scroggins, 880 F.2d 1204 (11th Cir. 1989), cert. denied, 494 U.S. 1083 (1990). Also, conduct which was not charged may also form the basis for the relevant conduct

---

[2] According to Best Marketing's records Penney's first sale was on 1/12/96. The total sales at Best Marketing during the 6 months while Penney was there was approximately $2,399,944. If reduced by 30% (the estimated value received by the customers), the total losses during those 6 months is approximately $1,679,961. (The total sales figure of $2,399,944 was arrived at by deducting one month of sales from a chart showing the last 7 months of sales at Best Marketing, from 12/15/96 to 7/16/96.)

[3] In addition, a sentencing court considers a broader spectrum of evidence than a jury. In this case, the jury seemed to draw a distinction between counts for which the victim was available to testify, and those in which the victim was unavailable. The jury's questions during deliberations reflected their cautiousness in relying on the tapes of the sales made to customers who were unable to fly to Miami. (As the court is aware, one witness, Mr. Clark, was unable to testify due to his father's illness and death. Other victims were unable to come for various reasons, such as Mr. Baker who was in a serious accident, and others who were in ill health or taking care of an ill spouse.)

calculation. United States v. Ignancio Muncio, 909 F.2d 436 (11th Cir. 1990), cert.denied, 499 U.S. 938 (1991).

This Court may correctly sentence Penney based on the losses caused by Best Marketing while he was there. See United States v. Hall, 996 F.2d 284, 286 (11th Cir. 1993)(in telemarketing operation, participants who made similar misrepresentations, shared lead sheets and phones, and were aware of each other, are properly sentenced on the total fraud loss).

    c. Other measures of relevant conduct

The evidence supports a finding that the activity in this case was jointly undertaken and that all the sales while Penney was at Best were foreseeable to him, in accordance with U.S.S.G. §§1B1.3(a)(1)(B) and (a)(2). However, should the Court find it appropriate to look to other measures of relevant conduct, the Court may look to the acts committed by Penney himself, which is the first part of the definition of relevant conduct. See U.S.S.G. §1B1.3(a)(1)(A). While he was at Best Marketing, Penney made approximately $372,163.34 in sales. If this amount is reduced by 30% (the estimated value of what was sent to the customers), the loss amount caused by Penney's own sales is approximately $260,514.34.

**B. More than minimal planning**

Penney makes a bare assertion that his offense level should not be adjusted by 2 points due to "more than minimal planning," a specific offense characteristic under the fraud guideline. Penney's claim is incorrect.

Section 2F1.1(b)(2) provides for a 2 level increase if the offense involved (A) more than minimal planning or (B) a scheme to defraud more than one victim. The 2 level enhancement is appropriate not just because of more than minimal planning, but also because Penney's offense

involved a scheme to defraud more than one victim. Application note 3 to section 2F1.1 states that a "scheme to defraud more than one victim" refers to a design or plan to obtain something of value from more than one person. "Thus, a wire fraud in which a single telephone call was made to three distinct individuals to get each of them to invest in a pyramid scheme would involve a scheme to defraud more than one victim." §2F1.1, app. note 3. In this case, Penney's design and plan was to obtain money by making sales over the phone to as many people as he could, as many times over as he could. The adjustment is therefore appropriate.

In addition, the offense involved more than minimal planning. Section 1B1.1, application note 1(f), defines "more than minimal planning." It is "deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses." In this case, Penney was a reloader. His telemarketing goal was precisely to make repeated sales not only to numerous people, but to the same person over and over, even using a different name and voice if necessary. Moreover, there was preparation for each call. As stated above, the reloaders frequently checked credit before making a call. The evidence relating to count 19 showed that Penney had done this before calling Irving Amron. Penney also had to decide which pitch he was going to use, the amount of the purchase he would propose, and the premiums he was going to offer, and specifically which premium he intended to send. After the agreement on the phone, Penney made sure his customers followed through with their confirmation letters. The offense in this case involved detailed planning. The adjustment is completely warranted. See Hall, 996 F.2d at 286.

7

### C. Minor role

Penney's claim for a minor role is contrary to the applicable law and the facts of this case. The sentencing guidelines recognize that when offenses are undertaken by several participants working together, those participants may have varying roles. The guidelines provide for offense level enhancements for leaders, organizers, managers and supervisors. See U.S.S.G. §3B1.1. The guidelines also provide for offense level reductions for minor and minimal participants. See U.S.S.G. §3B1.2. Some participants are neither leaders nor minor, and their offense level is not adjusted down or up based upon their role.

While at other times Penney claims he did not join others in a scheme, for purposes of this argument he claims that he was "subordinate to, managed by, and subject to instruction from" others. Penney is correct that Ed Hexter, the owner of the company, was more culpable than him. Hexter was a leader and organizer, and it would have been appropriate for him to receive an enhancement for his role. Also Penney is correct that he was not a manager. There is no request for him to receive a role enhancement as a manager.

Penney claims to be ignorant of matters that were part of the evidence in his own trial. Penney claims he does not know why he is considered a "top" reloader, and why his position as a reloader matters.

Penney is considered a "top" reloader because he was one of the four highest selling salesmen at Best (along with his codefendants). The evidence in this case showed that after the search warrant was executed, the agents examined the sales records of the company to determine who were the salesmen who made the most sales. The evidence in this case also showed that reloaders were the more experienced and skilled sales people. They had the difficult job of

8

convincing people to buy over and over again, and in increasing amounts. They had discretion to choose among various premiums and advertising items. They were provided a secretary, and the secretary was paid for by Best if the salesman's sales were sufficiently high for that week. Penney's position was in no way minor and he has not explained why it could be viewed that way. Penney also ignores that there were people who were in a lower position than he was, such as the less productive reloaders, the fronters, the secretaries, etc. His claim that he was a minor participant has no merit.

### D. Criminal History

In his criminal history, Penney has two convictions for driving under the influence. The first one was in 1986 and he received probation.[4] The second one was in 2000. That one resulted in an accident, and the defendant fled the scene. After a chase Penney was located, and there was evidence of alcohol use, including Penney's own statement. For that second incident, the defendant was ordered to serve 90 days in jail.

Penney claims that he should not get 2 points for his sentence in his most recent DIU conviction. He claims his case falls under §4A1.2, application note 4, which relates to cases in which the judge gives the option of a fine or incarceration. However, according to the records received by the U.S. Probation Office, the defendant was required to serve 90 days. It was not optional. Thus, Penney's case does not fall under application note 4. The 2 criminal history points are required for a sentence of at least 60 days, according to §4A1.1(b).

---

[4] This sentence was imposed on 12/22/86, within ten years of the defendant's commencement of the instant offense, on 1/12/96. Thus, this sentence should have been counted under section 4A1.2(e)(2). However, only 1 point would be added according to section 4A1.1(c), and it would have no effect on the defendant's criminal history category.

### E. Restitution

Penney claims the Mandatory Victim Restitution Act does not apply to his offenses. However, the PSI correctly states that it applies to counts 17, 19, and 20, which took place after its effective date in April of 1996. The specific losses as to those counts are: $732.31, $1,447.33, and $1,359.60. The total mandatory restitution is $3,539.24. If the defendant is imposed a 3 year period of supervised release, the government requests that Penney be ordered to make payments as to the mandatory restitution in the amount of $98.31 per month.

As to counts 12, 13, and 14, Penney claims he is not able to pay restitution. The specific losses as to those counts are: $1,225.58, $1,409.55, and $628.34. They add up to $3,263.47. Following a term of incarceration, Penney may be under supervised release for 3 years. He could pay this portion of the restitution by making payments of $90.65 a month during that time. Aside from the fact that Penney has not provided complete information about the current state of his finances, he has offered no reason why he would not be able to work and pay this portion of the restitution over his supervised release period.

## II. Other objections to the contents of the PSI

Penney seeks to strike portions of the offense conduct narrative because it included narratives provided by certain individuals who were not required to testify at trial. However, Penney does not show or even claim that any specific facts are inconsistent with the trial evidence or otherwise incorrect. Without any such claim, there is no reason to alter the narrative in the PSI.

### III. The defendant should be sentenced at the high end of the applicable range

In addition to the nature of the offense, there are various reasons why this Court should consider a sentence at the high end of the guideline range. They include Penney's prior years in similar telemarketing operations, Penney's sales to elderly individuals, and Penney's use of his skill as an actor to help him defraud his victims. Penney's own index cards and notes, admitted at trial, show the ages and illnesses of a number of his customers. He continued to sell to them even after taking note of their age and/or illnesses. The government is prepared to offer additional testimony and records regarding Penney's sales at similar telemarketing operations, particularly Datron, where he worked with his codefendant, Charlie Martin. Some of the sales were to the same customers he sold to when Penney went to Best Marketing. The government is also prepared to offer testimony about Penney's acting training and experience.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
ANA MARIA MARTINEZ
ASSISTANT UNITED STATES ATTORNEY
FLORIDA BAR NO. 0735167
99 N.E. 4th Street
Miami, Florida 33132
Tel: (305) 961-9431
Fax: (305) 530-6168

CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2002, a true and correct copy of the foregoing was hand delivered to William Norris, Esq., 7685 S.W. 104th St., Suite 220, Miami, FL 33156.

_____
ANA MARIA MARTINEZ
ASSISTANT UNITED STATES ATTORNEY