UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6270-CR-GRAHAM

UNITED STATES OF AMERICA,

Plaintiff,

v.

HANNIBAL PENNEY,

Defendant.

_____/





## SUPPLEMENT TO DEFENDANT MOTION FOR BOND PENDING APPEAL.

COMES NOW Defendant Hannibal Penney, by counsel, and files as supplement to his pending motion, submitted pursuant to Rule 46(c), *Fed.R.Crim.P.*, and 18 U.S.C. § 3143, for release on bond pending appeal of his judgment and conviction, the attached draft pages of his anticipated appeal showing that a good faith basis exists to challenge the sufficiency of the evidence to support the jury's verdict of guilt on those counts as to which he was convicted.

Mr. Penney will surrender this Friday, January 17, 2003, at Federal Prison Camp Nellis to begin service of the ten-month sentence imposed on him by this Court. His initial brief on appeal is due on January 19, 2003. Undersigned counsel anticipates that the initial brief will be timely filed, with no extensions of time to file having been sought. Notwithstanding the promptness of this initiation of the appellate review process, the time

that it will take to complete the briefing schedule, submit the case for decision and ultimately resolve the issues probably will take longer that Mr. Penney's sentence. If he is exonerated after he has completely served his sentence, Mr. Penney's victory will certainly qualify for the label pyrrhic.

Attached hereto are drafts of the "statement of the facts" section and the first argument section of Mr. Penney's initial brief. Mr. Penney will also seek review of the Court's ruling on "the Hexter tapes" and the exclusion of Attorney Sam Field's testimony. When the testimony that relates to the counts of conviction is isolated and written down, it becomes clear that the sufficiency of this evidence to sustain a verdict of guilt is, at best, questionable.

Mr. Penney asks for the opportunity to have his opportunity for appellate review before he serves his sentence.

Respectfully submitted,

William M. Norris
William M. Norris, P.A.
7685 S.W. 104 Street, Suite 220
Miami, Fl 33156
Tel. 305-661-6118
Fax. 305-667-6161
Attorney for Hannibal Penney

**B. Statement of the facts:**

Hannibal Penney appeals from his conviction and sentence on six counts of wire fraud in violation of 18 U.S.C. § 1343. Most of the trial was devoted to the government's efforts to prove that Hannibal Penney and Roby Dudley participated in a wire fraud conspiracy, as to which the jury acquitted, to Roby Dudley's ten substantive counts, as to which the jury acquitted and to the remaining four substantive counts as to which Mr. Penney was acquitted.

The evidence as to the counts of conviction, which are the subject of Mr. Penney's appeal, was quite compact. Each of Mr. Penney's customers, who the government cast as victims, testified.[1]  In addition, the sales call to each customer was tape recorded and played for the jury. The testimony as to each of the counts of conviction is set forth below in detail, since Mr. Penney seeks review of the sufficiency of the evidence to support a verdict of guilty as to wire fraud. The counts are addressed in the order the witnesses testified:

**1. Dr. Irving Amron; Counts 13 and 19:**

---

[1]  The first witness, Dr. Irving Amron, testified only as to Count 13. Over defense objection, the tape recording of the May 29, 1996, sales call to Dr. Amron relating to Count 19, was played, but no other testimony about this count was offered.



In Count 13 of the indictment, Mr. Penney was charged with having committed wire fraud against Irving Amron on March 26, 1996, and again, in Count 19, on May 29, 1996.

Irving Amron was eighty-one years old at the time of trial, but he suffered no diminishment of his mental faculties.[2]  His doctoral degree was in physical chemistry and he had worked in this field for Bell Laboratories developing batteries.  Since 1987, he had maintained a consulting business in New Jersey, Amron Consulting Service, that consulted regarding batteries and he remained current in the field (R5:91).  He purchased engraved pens, that he handed out to friends.  Dr. Amron had dealt with an advertising specialties salesman he knew as Dr. James St. James, over the telephone, since 1992.  "I dealt with him before and he seemed to be treating me reasonable well" (R5:97).  Dr. Amron had never complained about the product he purchased from Best Marketing, Inc., or about the premiums he received (R5:106).

---

[2]  Dr. Amron's educational and employment background mark him as a man of exceptional intellect.  He has had the good fortune to life longer than most and the better fortune to have lost little of his intellect over the years.  The only time during direct and cross examination that he had any problem with recalling events six years in the past was once, regarding Robin Davis' mention to him of the Croton watch, when it served him well to forget.  "I would have to listen to that again.  I believe it may have been mentioned but I am not certain" (R5:115).



The dispute that gave rise to Count 13 centered around Dr. Amron's expectation that he would receive a Rolex watch as a premium to his order of engraved pens.  Dr. Amron testified that he got a 14 karat gold man's watch with a leather strap, but he characterized it as a copy of a "Movado," with the name "Croton" on it, and he was disappointed because he was expecting a "Rolex" (R5:100).   The question is whether this disappointment sufficiently establishes a fraud.

The tape recording and the transcript of Mr. Penney's telephone call to Dr. Amron does show that Mr. Penney spoke of a "Rolex" watch as one of the premiums he could receive.[3]  However, he expressly told Dr. Amron that the premiums included a "Rolex," a "Lucien Piccard," or a "Croton" watch (R5:114).  Dr. Amron protested.  Mr. Penney agreed to remove the "Lucien Piccard" from the list, but refused Dr. Amron's entreaties that he also strike the "Croton."[4]

_____

[3]  It is interesting to note that a Hawaiian vacation was also on the list.  Dr. Amron said he was not interested in that and Hannibal Penney said he knew a lady in the computer division who could divert that premium to some one else.  It was not until redirect examination that the government suggested that this might show, somehow, Mr. Penney's power over the process that would serve to defraud Dr. Amron (R5:124).

[4]  The following colloquy on cross-examination makes the point: "Q. Well, he said to you it was the Rolex, the Croton or the Lucian Piccard. Right? A.

The government jumped over the next step in Best Marketing, Inc.'s marketing methodology, the recorded confirmation call by Robin Davis to the customer to make sure that the terms and conditions of the sale were understood and that the advertising order was correct.  This is an omission that is critical to an informed evaluation of the government's charge of fraud: Robin Davis told Dr. Irving Amron that the premium was a "Rolex" or a "Croton" watch, and sent Dr. Amron a written confirmation of this which Dr. Amron signed and returned to Best Marketing, Inc.

The government's proof jumped over the recorded confirmation telephone conversation, and went directly to the confirmation letter that Robin Davis sent to the customer to confirm in writing what she had attempted to confirm verbally.  The letter Davis sent listed a "lady's watch."[5] Dr. Amron changed this to "men's" and added "Rolex," initialing both

---

Later on, yes. Q. You said you didn't want the Lucian Piccard. Right? A. Yes. Q. And he took that off the list? A. I also didn't want the Croton. Q But he refused to take that off the list? A. He refused. Q. He refused." (R5:114).

[5]  This letter was identified as part of GEx #47, Bate stamped 1039 (R5:98).

D R A F T

changes. The government then introduced a second letter, dated March 27, 1996, that described this premium as "man's 14 karat gold watch with leather band." The prosecutor added the editorial: "no name or anything" (R5:97). The transcripts of both Hannibal Penney's sales call to Dr. Amron and Robin Davis' confirmation call to Dr. Amron make it express that the watch in question was either a "Rolex" or a "Croton."

Dr. Amron understood. He understood that the man who called himself "Dr. James St. James" was a salesman, who was restricted in what he could and what he could not offer. Dr. Amron understood that a contract requires a meeting of the minds. Here, there was a meeting of the minds regarding the opportunity to receive either a Rolex or a Croton watch. That was the contract Dr. Amron signed. That is what he got. Dr. Amron clearly hoped he would receive the Rolex, but there was no fraud.

The government presented no testimony in support of Count 19. Dr. Amron said nothing about it while he was on the stand. Over defense objection, the government was allowed to play the tape recording of the sales call by Hannibal Penney to Dr. Amron that generated this sale.

## 2. Ms. Vickie Keel, Count 14:

Vickie Keel lived in Gadsden, Alabama, a town near Birmingham, and ran two video rental businesses, Video World in Boaz, Alabama, and Movie

World in Fort Payne, Alabama (R6:108). Periodically, she received advertising specialty sales calls from James St. James; "There was some times when he would call me I wouldn't purchase and some times I would. It was just depending on my financial situations" (R6:110).

Ms. Keel identified a verification letter dated March 27, 1996, memorializing her agreement to purchase 220 key tags for $799.95. She said that the salesman "insinuated if you place this order that you would be eligible for either the pickup truck or pool table or the Tiffany, bracelet from Tiffany, that you was guaranteed one of them, that he was going to see that you got one of them extra items" (R6:111) She conceded that the verification letter said nothing of the sort.[6] The verification letter promised an 8 by 10 framed Terry LaBonte autographed picture, eight six ounce steaks for Stockyard and a box of Sees Candy Id.) She received each of these items and the advertising specialty item she purchased.

The government then played the tape and highlighted portions of it to demonstrate that Mr. Penney had defrauded Ms Keel. Unfortunately, Mr.

---

[6] On redirect examination, it was revealed that this inducement was not made on the telephone call on which Count 14 is based. It was made, according to Ms Keel, on some other, undetermined telephone call (R7:24). Even if this is accepted as true, it does not support the count of conviction.



Penney's statements support the conclusions urged by the government only if read through lenses tinted in a shade unknown to our jurisprudence or to our commerce.

The government referenced a place in the transcript at which Penney spoke of a big promotion in the future and referred to the spinning of "the big wheel on April 26th" (R7:4). Ms Keel said this meant: "He said you was going to be guaranteed to win one of those top awards" (R7:5). Then the government referenced a place in the transcript at which Penney said "I got Vickie here and I did it for her. I got it cleared though the board, the bookkeeper" (R7:5). Ms Keel said this meant "he is telling me he got it cleared to put my name on the top of the list to win one of those prizes" (Id.).[7]

Vickie Keel was an auto racing enthusiast and a fan of racing driver Terry LaBonte, so cross-examination explored the way LaBonte's fame had

---

[7] Ms Keel demonstrates that the passage of time can mold the memory of witnesses in a way that serves the prosecution. Before she had an opportunity to review with the prosecutor the tape recording of her conversation with Mr. Penney and to read the transcript of that conversation, she had told the FBI that Dr. St. James had guaranteed that she was going to win a car (R7:9). Such a guarantee, of course, is not in the tape or the transcript. There is no support in the record showing that such a guarantee was ever made.

DRAFT

been used to sell corn flakes. Penney Exhibit 6D was a box of Kellogg's Corn Flakes promoting, with a picture of Terry LaBonte and his racing car, an opportunity to win a new 2002 Chevrolet Monte Carlo SS (R7:18). All that was necessary to win was the collection of six decals, one of which was in the box. Remarkably, Kellogg's announced "no purchase necessary." Counsel asked Ms Keel how you would get the decal out of the box unless you buy the box? She responded: "They could give it to you, I guess" (R7:19).

Vickie Keel was a business woman. She signed a contract. She agreed to pay $799.95 for 220 key chains, custom imprinted with her company's name and address. In addition, Best Marketing, Inc., agreed to award premiums of an autographed photograph of Terry LaBonte, six steaks and a pound of candy. The contract was fully met. This contract was placed in evidence as Penney Exhibit 14A (R7:13-14). There was no fraud.

On redirect examination, the prosecutor referred Ms Keel to other calls from Mr. Penney, other than the one played in court, "at least one of those" she had the opportunity to review. Penney objected (R7:24). The prosecutor asked: "What is your recollection of what Dr. St. James said to you in the other times that calls were made?" Ms Keel answered: "One time he called and he said you was guaranteed to win either a pickup or a Tiffany bracelet or

a pool table..." (R7:24)...This was exactly the claim she had made to the FBI that was unsubstantiated by the telephone call inquestion.        Given the record in this case, it is remarkable that the prosecutor would elicit this kind of testimony.  The witness had made a pretrial statement to the FBI that was not borne out by the tape the government chose to play.  The record shows that they had every telephone conversation that occurred on 20 extensions at Best Marketing, Inc., from February 8, 1996 until July 17, 1996, including Hannibal Penney's extension.  If the government had such a tape, why did they not play it or at least produce it?  If they did not have such a tape, how could they ask such a question?

### 3. George Bayer, CPA, Count 17:

George Bayer worked as an office manager at a local grain elevator in Sutton, Nebraska and did accounting business as George Bayer, CPA (R8:72-73).  He received calls several times from different people at Best Marketing and had made three or four prior purchases.  In 1994, he had a dispute with Best.  Mr. Bayer sought to be released because he did not have the money to pay for his order; Best viewed him as bound by his contract; the credit card company reversed the charges (R8:74-75).

On May 7, 1996, Hannibal Penney, using the telephone name of Dr. Grant Maxwell, called Mr. Bayer and secured from him an order for a dozen

custom engraved pens for $1,999 (R8:76-77). Again, Mr. Bayer later claimed inability to pay, and, subsequently, the price was reduced to $999.95 (R8:78).

At trial, George Bayer claimed that he had great expectations in reliance on what Hannibal Penney had said to him. The genuineness of these expectations is certainly open to question, in light of Mr. Bayer's own statements.[8]

### 4. Dr. Terry Nofziger, Count 20:

Dr. Terry Nofziger was a physician with a family practice who lived in Paoli, Indiana (R9:24). His first contact with Best Marketing was in the 1980's, when he responded to a telephone sales offer with the purchase of advertising specialty items (R9:25). Over the years, he had purchased pens on multiple occasions, using the advertising items in his medical practice and receiving premiums or awards as offered, including a television and a lady's watch, that he recalled. His only complaint was that he had received pens with blue ink rather than black ink, but this problem was corrected when he brought it to BMI's attention. Dr. Nofziger did feel the pens he got from

---

[8] "Q. Now, you don't expect, do you Mr. Bayer, in exchange for the payment of $900 not only to receive twelve of these engraved pens, but also to win a brand new car, do you? A. Not really, no.
Q. Not really. How could Dr. Grant Maxell give everybody who paid 1,000 a new car? A. They couldn't." (R8:91).

Hannibal Penney were better quality than he had purchased in the past.

Dr. Nofziger recalled being a contender for an antique Mercedes on one of BMI's prior promotions. His subjective belief about what Hannibal Penney had said to him, when balanced against the repeated and express statements to the contrary by Mr. Penney and others at BMI are at the core of whether Hannibal Penney committed wire fraud.

Hannibal Penney, using the telephone name Dr. Grant Maxwell, called Dr. Nofziger on June 28, 1996. This call was recorded and transcribed (GEx 20A and B; R9:28). What the tape showed was that Mr. Penney told him he would receive a premium of steaks and one of a group of other premiums with his order. Dr. Nofziger confirmed that he had "verified the order of the forty engraved pens, and then, in addition, products will be sent including the bonuses, eight six ounce steaks from Stockyard Packing, and one of the following six bonus premiums, Chrysler automobile, GMC pickup truck, two-seater pontoon-style Bass boat, 17th century style roll- top desk and $5,000 check" (R9:30). This is what Mr. Penney told him: this is what Robin Davis told him during the verification call; this is what the letter contract Dr. Nofziger signed stated. Dr. Nofziger dismissed this: "I felt like the itemization of these various things at the end of his conversation and in this letter were formalities, that he had assured me that it is definite that I am

going to be receiving one of the vehicles" (R9:30-31). Mr. Penney had

bgiven no such assurances.

The prosecutor attempted to highlight the issue of random computer

selection, but, curiously, Dr. Nofziger discounted this, saying that he did not

believe that there would be random computer selection, since he believed he

would get the car (R9:30).

Ultimately, even Dr. Nofziger receded from his stated conviction that

Hannibal Penney had created in his mind an iron-clad expectation that he

would win a car. Despite the witness' claim of expectation that he would get

a car, at the time of the conversation with Mr. Penney, Dr. Nofziger asked for

a picture of the roll-top desk. When asked about this, Dr. Nofziger said:

"Yeah, because I had the sinking feeling I was going to end up with it"

(R9:42). That is what he ended up with, and he had been

promised nothing more.[9]

---

[9]  The following exchange between counsel for Mr. Penney and Dr. Nofziger
summarizes the issue (R9:37):
"Q. But you chose in your mind to assume that you were going to receive the
top of the list, rather than something further on down the list. Isn't that why
you told us? A. Based on the conversation on the phone, yes, I did.
Q. But what he told you is he guaranteed you would receive one of them.
Right? A. Yes.



**5. Terrence Michael "Mike" Carey, Count 12:**

Mike Carey, from Mount Pleasant, Michigan, owned AM and FM

radio stations. On February 16, 1996 he received a telephone call from

Hannibal Penney, using the telephone name Dr. James St. James. Mr. Carey

purchased thirty heavy-weight black pens, custom engraved "WMMI/WCZY

FM." He received as a premium a home entertainment system which he

described as "a K-Mart boom box" (R10:6). After this purchase, which

underlay the count of conviction, he made a second purchase on June 21,

1996, and received, in addition to the product he ordered, a pontoon-style

---

Q. Robin Davis told you that. Right? A. Yes.
Q. And the letter told you that. Right? A. Aha.
Q. And you signed it. Right? A. I did.
Q. You agreed for the payment of $1,695.95 that you would purchase the
forty custom engraved pens. Right? A. Yes.
Q. And that you would receive as a bonus to the order one of the products
here and that you were guaranteed satisfaction with the product. Right? A.
That's what I signed, yes."

Bass boat as a premium (R10:6).

Mr. Carey's direct testimony consists of 22 questions and answers that use less than three complete pages of transcript. It is impossible to cast this testimony in a light most favorable to the verdict because there is nothing in the testimony that suggests that Hannibal Penney committed a wire fraud as charged in Count 12. There probably was no fraud. Mr. Carey certainly was not displeased; he made another purchase from Mr. Penney on June 21, 1996.

## **ARGUMENT**

I. THE EVIDENCE AT TRIAL WAS INSUFFICIENT AS TO EITHER

PRONG OF WIRE FRAUD, EITHER OF INTENTIONAL

PARTICIPATION IN A SCHEME OR ARTIFICE TO DEFRAUD OR OF

INTERSTATE COMMUNICATION, TO SUSTAIN THE VERDICTS.

The statute under which Hannibal Penney stands convicted, 18 U.S.C.

§ 1343, provides:

> Whoever, having devised ... any scheme or artifice to defraud, ...
> transmits or causes to be transmitted by means of wire ...
> communication in interstate ... commerce, any ... sounds for the
> purpose of executing such scheme or artifice, shall be fined
> under this title or imprisoned ....

This statute requires the proof of two elements: first, the knowing and

willing participation in a scheme or artifice to defraud with specific intent to

defraud, and second, interstate wire communications in furtherance of the

scheme. *Neder v. United States*, 527 U.S. 1, 21, 119 S.Ct. 1827, 1831, 144

L.Ed.2d 25 (1999). Neither prong was proven. Mr. Penney's convictions

must be reversed.

### A. Proof of the interstate nexus of the telephone calls charged:

The government either did not know that they had to prove this element

or they forgot. Direct proof would have been simple - the recipient of the

telephone call was on the stand. All the prosecutor had to ask is where he

was when he got the call.

Having forgotten to made direct proof, the government reaches for "circumstantial evidence." The record clearly shows where each of the five customers lived and where they worked. There is also evidence that other means of interstate communication, either wire communication by facsimile, by telephone conversation with other people, by Federal Express and otherwise, were employed on other occasion. However, there is no evidence of where these five people where were when Hannibal Penney initiated the telephone call that establishes the wire predicate for each offense of conviction. Since each wire communication is a separate offense, see *Henderson v. United States*, 425 F.2d 134 (5th Cir.1970), the failure to establish the interstate nature of each or any of these telephone calls is fatal.

At the close of the government's evidence, the defendants moved pursuant to Rule 29, Fed.R.Crim.P, for judgments of acquittal for this specific failure of proof (R:). The Government filed a pleading, "Government's List Of Citations To The Record In Support Of Its Response To Defendants' Rule 29 Motions," (R1:), which simply highlights this failure.

Proof of the telephone number dialed by Hannibal Penney, if in an area code that serves the hometown of the customer, might give circumstantial evidence that Mr. Penney made a wire communication in interstate

commerce. Cellular telephones have specific area codes by can be reached where ever the subscriber may be located and hard-wired telephones can have a call-forwarding feature that permits the call to be received anywhere. However, the government did not even offer proof of the telephone number Mr. Penney dialed. In short, the government marshals, as so-called "circumstantial evidence," what is nothing more than biographical information about the witness or about evidence of other wire communications, not charged in the indictment.

We are left with the government grasping at straws. "Dr. Grant Maxell repeats Clark's fax number of 716-344-3297" (R1:-5). How can this be characterized as circumstantial evidence of where Mr. Clark was when Mr. Penney spoke to him?

**B. Proof of the intent to defraud:**

There is no question about what Hannibal Penney said to each of his customers in the counts of conviction - there are verbatim transcripts. What Hannibal Penney said does not reach the level required for criminally actionable fraud under the statute. Each of the five customers of Best Marketing Inc., who made purchases under circumstances the jury found to be wire fraud, entered into written contracts with Best. Each of the five ran businesses and each of the five understood what was required for a contract.

None of the five claimed that they misunderstood what the essential terms of the contract were. Hannibal Penney's only part in this process was the initial telephone call.

Since this was Mr. Penney's role, it would appear that if Mr. Penney committed any fraud, it was by fraudulently inducing these five people to enter into the contract with Best. With some of these folks, its hard to tell what the fraud in the inducement was.

Nofziger clearly expressed his expectation that there would be a new car in his driveway within ten days, but his conduct at the time is not consistent with this expression. He asked for a picture of the roll-top desk, because he had a "sinking feeling." Carey and Bayer's expectations are not expressed. Amron was upset that he did not get a Rolex watch, but he was not so upset that he did not buy again from Mr. Penney. Keel has not recorded reason to be upset about anything; she had to be led by the prosecutor to "other conversations" that were not in the record to create any basis for an expectation not fully met by Mr. Penney.

A significant precedent in this circuit is *United States v. Brown*, 40 F.3d 1218 (11th Cir.1994). That Court observed that "'puffing' and 'seller's talk' is still not actionable under the mail fraud statute," *Id.*, 1557, but went considerably deeper into business practices in the real world to reverse a

conviction, *Id.*, 1558-59:

> We know that--under certain circumstances--a person, outside of
> a fiduciary relationship, can rely on representations of future
> wealth or investment potential. *See U.S. v. Bruce,* 488 F.2d
> 1224, 1229 (5th Cir.1973) (defendant made "impossible
> representations of possible wealth to potential investors"); *U.S.
> v. Kail,* 804 F.2d 441, 445 (8th Cir.1896) (defendant termed
> coins valuable investment). This circumstance-- which is present
> in most mail fraud cases--arises where a reasonable jury could
> find that a person of ordinary prudence would not know that he
> should not rely on these representations.
>       We conclude in the case before us now that reasonable
> jurors could not find that a person of ordinary prudence, about to
> enter into an agreement to purchase a GDC home in Florida,
> would rely on (that is, in the words of *Pelletier*, "act on") the
> seller's own affirmative representations about the value or rental
> income of the GDC homes.  Therefore, a "scheme to defraud"
> within the meaning of the federal criminal statutes has been not
> proved.

Hannibal Penney sold advertising specialty items and awarded

premiums to his customers at grossly marked up prices - but these items were

freely available to his customers from other sources had they cared to look.

*Brown* makes clear that what Mr. Penney was doing was not a scheme to

defraud as that term is understood in the federal statutes, *Id.*, 1559:

> A "scheme to defraud" under the pertinent criminal statutes has
> not been proved where a reasonable juror would have to
> conclude that the representation is about something which the
> customer should, and could, easily confirm--if they wished to do
> so--from readily available external sources



The pattern of business activity examined in the *Brown* case is similar to Best

Marketing, *Id.*, 1561-62:

> GDC provided its purchasers with what was promised--a home
> in a pre-planned Florida community. While these homes might
> not be "worth" as much as some buyers would want, no one
> disputes that these GDC homes are of considerable value; and,
> we stress this case is not a case where a seller promised great
> value but sold something actually worthless or completely unfit
> for the purchaser's purpose. The GDC homes are not alleged to
> be defective in construction and hundreds of thousands of
> Floridians live in GDC's communities today; tens of thousands
> live in GDC-built homes. Defendants exaggerated the market
> value of these homes. These homes, however, are good homes--
> as far as was alleged by the government, just as good as were
> promised by GDC-- it is just that some GDC customers could
> have obtained a similar home for less money.

The *Brown* court concluded, Id.1562:

> "The law is a causeway upon which, so long as he keeps
> to it, a citizen may walk safely." Robert Bolt, "A Man For All
> Seasons" Act II, 89 (Vintage 1960) (speech of Sir Thomas
> More). To be free of tyranny in a free country, the causeway's
> edges must be clearly marked. The exercise of federal
> government power to criminalize conduct and thereby to coerce
> and to deprive persons, by government action, of their liberty,
> reputation and property must be watched carefully in a country
> that values the liberties of its private citizens. Never can we
> allow federal prosecutors to make up the law as they go along.

*Brown* quoted *United States v. Trenton Potteries,* 272 U.S. 392, 398 (1927):

> So, we today heed the warning of the Supreme Court and
> "hesitate to adopt a construction making the difference between
> legal and illegal conduct in the field of business relations depend

upon so uncertain a test as whether prices are reasonable."

Every one of Hannibal Penney's customers in the counts of conviction was a
repeat customer, some of them repeat customers over many years. They are
not victims, despite the government's apparent effort to convince them that
this is what they were. They knew what they were buying and that is exactly
what they got. The government may disapprove of the pricing structure
Edward Hexter created at Best Marketing, Inc., but that does not make it
actionable fraud under the federal wire fraud statute. A reasonable jury could
not find that Mr. Penney was guilty of wire fraud in the six counts of
conviction.



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing supplement to motion for bond pending appeal was mailed postage prepaid this 15th day of January, 2003; to:

AUSA Anna Martinez
99 NE 4th Street
Miami, FL 33132

William M. Norris