UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6270-CR-GRAHAM



NIGHT BOX
FILED

MAR 26 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES OF AMERICA

v.

HANNIBAL PENNEY

_____/

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S MOTION FOR BOND PENDING APPEAL

The United States of America, by and through its undersigned Assistant United States

Attorney, respectfully files this response to defendant's motion for bond pending appeal. Penney

cannot meet the requirements under 18 U.S.C.§3143(b); therefore, his motion should be denied.[1]

### Standard for bond pending appeal

Under section 3143(b), defendants who have been convicted and sentenced to a term of

imprisonment shall be detained, unless the court finds by clear and convincing evidence that the

person is not likely to flee or pose a danger to the safety of any other person or the community,

*and* that the appeal is not for the purpose of delay and raises a *substantial question of law or fact*

*likely to result -- in reversal, an order for a new trial, a sentence that does not include a term of*

---

[1] Penney had also filed a motion to extend the surrender date until he was designated to a facility. The undersigned received that motion but never received the motion for bond pending appeal until the court let the undersigned know that it had been filed. Subsequently, this court extended the surrender date pending a full briefing. The merits of the motion for bond depend on the merits of the issues raised on appeal. This appellate section was in the process of responding to Penney's appellate brief, and this was concluded March 24, 2003. (The government notice of appeal mentioned by Penney's counsel was withdrawn early in the process.) The government's appellate brief is attached.



1

*imprisonment, or a reduced sentence to a term of imprisonment less that the total time already served plus the expected duration of the appeal process.*

The United States recognizes that Penney may be able to present evidence to satisfy the Court that he will not flee. However, Penney has not raised any substantial question likely to result in reversal. Thus he has not met the requirements for bond pending appeal.

### The issues raised by Penney are not substantial questions likely to result in reversal

Penney raises three issues in this brief. He challenges the sufficiency of the evidence with respect to Penney's participation in a scheme to defraud with the intent to defraud, and with respect to the interstate nature of the phone calls charged. He also challenges this court's denial of the suppression motion. Finally, he challenges this court's limitation of some of the questioning of Mr. Field's, who was the attorney for the deceased codefendant, Ed Hexter.

#### The appellate standards of review

The jury's verdict and this court's rulings will not be easily overturned. Contrary to Penney's assertion in his motion, it is not simply a question of whether "reasonable men could differ." (Motion at 4.) The men and women of the appellate court will not simply substitute their judgment for the judgment of the jury or of this court.

Whether there is sufficient evidence in the record to support a guilty verdict is a legal question that is reviewed *de novo*. However, the appellate court will view the evidence in the light most favorable to the government and will resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict. United States v. Yeager, 2003 WL 1056598 (11th Cir. March 12, 2003).

2

The ruling on the motion to suppress involved questions of fact and law. The appellate court will not overturn factual findings unless they are clearly erroneous. The appellate court will review the application of the law de novo. United States v. Anderton, 136 F.3d 747, 749 (11th Cir. 1998).

The court's evidentiary rulings regarding Mr. Fields, Ed Hexter's attorney, will not be overturned unless the appellate court finds an abuse of discretion. United States v. Hayes, 40 F.3d 362, 364 (11th Cir. 1994).

<u>There is no merit to Penny's appellate issues</u>

The issues have been now fully briefed by the appellate section of this office, and a copy of the government's brief is attached. The undersigned incorporates those arguments into this response.

1. <u>The evidence was sufficient for a rational jury to find Penney guilty</u>

Penney challenges the sufficiency of the evidence of the interstate nature of the calls charged in the indictment. Penney speculates that through call-forwarding features it might have been possible for the victims to have actually been in Florida the day that Penney called them. This is speculation and it is not based on any evidence. It was certainly reasonable for the jury to based its verdict on the overwhelming evidence that all the calls made by Best Marketing salesmen were made to out-of-state customers. As further detailed in the appellate brief, both government cooperating witnesses testified that that was the case. This was further supported by the testimony of the victims, the taped conversations, and the detailed business records kept by Best Marketing and their salesmen. Penney's claim has no merit.

3

Penny also challenges the sufficiency of the evidence of Penney's participation in a scheme to defraud with the intent to defraud. In his argument Penny limits his description of the evidence to portions of the trial. In part, he says that the customers should have known they might get any one of several premiums because they signed a verification letter to that effect. Penney omits the fact that the letter was part of the scheme, and even the letter's statement that premiums would be "randomly computer selected" was a lie. Several witnesses confirmed this and the jury was entitled to believe them.

Moreover, Penney strongly relies on a concept just overruled by the Eleventh Circuit. United States v. Yeager, 2003 WL 1056598 (11th Cir. March 12, 2003). As explained by the Eleventh Circuit, the question is not what the victims expected or actually did. The ultimate question is whether the defendant joined the scheme with the intent to defraud.[2] As more fully

---

[2]  In Yeager, the Eleventh Circuit stated:

Under 18 U.S.C. § 1341, a person, having devised a scheme to defraud, who mails any matter through the Postal Service or any commercial interstate carrier for the purpose of furthering or accomplishing that scheme, commits a federal offense . . . In *United States v. Brown,* 79 F.3d 1550, 1557 (11th Cir.1996), we held that a defendant may not be convicted of federal mail fraud unless there is proof that "a reasonable person would have acted on the [defendant's false] representations." . .. The federal mail fraud statute prohibits the use of the mail to further "scheme[s] ... to defraud." 18 U.S.C. § 1341. The use of the mail to further these schemes is a distinct evil punishable whether or not the scheme results in completed common-law fraud. Proof of reliance by the victim on the false representations of the defendant, though necessary to prove common-law fraud, has no place in prosecutions for federal mail fraud. *Neder v. United States,* 527 U.S. 1, 24-25, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999). *Brown,* to the extent that it holds the contrary, is overruled. A mail fraud conviction does require that the misrepresented facts be *material*--of a type that a regular person would regard as important in making a particular decision. *Id.* at 22-23, 119 S.Ct. at 1840. However, there is no requirement that the misrepresented material facts be believable--a defendant is subject to mail fraud liability even though he uses the mail to further a scheme based on ridiculous facts, as long as the subject matter of

4

explained in the appellate brief, there was ample evidence for a rational jury to find Penney guilty.

## 2. This court correctly denied the motion to suppress

This court held a full hearing on the facts and the law, and issued a detailed and well-reasoned opinion based on Eleventh Circuit law. Once again, Penney relies on case law outside this Circuit. His claim lacks merit.

## 3. This court did not abuse its discretion in limiting the questioning of Hexter's attorney

Penney has not shown any abuse of discretion by this Court in its rulings. Penney claims he was prejudiced because he would have liked to have asked more about Mr. Fields' review of scripts. However, Penney obtained such testimony from Goldberg and asked what he wanted of Hexter's son. This court also permitted him to ask Mr. Fields some questions. However, Mr. Fields was understandably unable to recall some things and at times unable to answer questions if they related to his attorney-client communications with Ed Hexter. Moreover, as explained in the government's appellate brief, it is clear that Mr. Fields was not Penney's attorney and that Penney did not even attempt to establish the required elements for an advice of counsel defense. Therefore the cases he relies on are inapplicable. This issue also has no merit.

---

the misrepresentation is important. "[C]riminal liability would exist so long as the defendant *intended* to deceive the victim [about a material topic], even if the particular means chosen turn out to be immaterial, *i.e.,* incapable of influencing the intended victim." *Id.* at 24, 119 S.Ct. at 1841.

**Conclusion**

Penney does not qualify for bond pending appeal, because Penney has not raised any

substantial questions on appeal that are likely to result in reversal.   Therefore, the United States

respectfully requests that this Court deny Penney's request for bond pending appeal.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY


By: _____

ANA MARIA MARTINEZ
ASSISTANT UNITED STATES ATTORNEY
FLORIDA BAR NO. 0735167
99 N.E. 4th Street
Miami, Florida 33132
Tel:  (305) 961-9431
Fax: (305) 536-4101



CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2003, a true and correct copy of the foregoing was
mailed to William Norris, Esq., 7685 S.W. 104th St., Suite 220, Miami, FL 33156.

_____

ANA MARIA MARTINEZ
ASSISTANT UNITED STATES ATTORNEY

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. **02-16050-II**

United States of America,

Appellee,

- versus -

Hannibal Penney,

Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## BRIEF FOR THE UNITED STATES

> Marcos Daniel Jiménez
> United States Attorney
> Attorney for Appellee
> 99 N.E. 4th Street
> Miami, Florida 33132-2111
> (305) 961-9123

Anne R. Schultz
Chief, Appellate Division

Stephen Schlessinger
Assistant United States Attorney

Suzan Hill Ponzoli
Assistant United States Attorney

Of Counsel

**United States v. Hannibal Penney, Case No. 02-16050-II**

**Certificate of Interested Persons**

Undersigned counsel for the United States of America hereby certifies that the following is a complete list of persons and entities who have an interest in the outcome of this case:

Dr. Irving Amron

George Bayer

Rick Carey

Roby Dudley

Samuel S. Fields

Mark Goldberg

Hon. Donald L. Graham

Edward Hexter (deceased)

Patrick M. Hunt

Marcos Daniel Jiménez

Joel Kaplan

Vickie Keel

Albert Z. Levin

Guy A. Lewis

Richard Brian Mateer

Charlie Martin

United States v. Hannibal Penney, Case No. 02-16050-II

**Certificate of Interested Persons**
**(continued)**

Ana Maria Martinez

Dr. Terry Nofziger

William M. Norris

Suzan Hill Ponzoli

Stephen Schlessinger

Anne R. Schultz

Debra J. Stuart

Harry Dohn Williams, Jr.

Kathleen W. Williams

Russel Jay Williams

Suzan Hill Ponzoli
Assistant United States Attorney

## Statement Regarding Oral Argument

The United States of America respectfully suggests that the facts and legal arguments are adequately presented in the briefs and record before this Court and that the decisional process would not be significantly aided by oral argument.

# Table of Contents

**Page:**

Certificate of Interested Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . c-1

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Certificate of Type Size . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case:

    1.    Course of Proceedings and Disposition in the Court Below . . . . . 1

    2.    Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        a.    Offense Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        b.    Testimony and Tapes Recordings From Six Victims . . . . 13

                Mike Carey:  Count 12 . . . . . . . . . . . . . . . . . . . . . . . . 13

                Dr. Irving Amron:  Counts 13 and 19 . . . . . . . . . . . . . 14

                Vickie Keel:  Count 14 . . . . . . . . . . . . . . . . . . . . . . . 17

                George Bayer:  Count 17 . . . . . . . . . . . . . . . . . . . . . . 18

                Dr. Terry Nofziger:  Count 20 . . . . . . . . . . . . . . . . . . 19

        c.    Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ii

## Table of Contents
### (continued)

**Page:**

    3.    Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Argument and Citations of Authority:

I.    The Evidence Was Sufficient To Support Penney's Wire Fraud

    Convictions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.    Proof of Scheme to Defraud . . . . . . . . . . . . . . . . . . . . . . . . . 24

    B.    Proof of Interstate Nexus . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        Mike Carey:  Count 12 (Mount Pleasant, Michigan) . . . . . . . . 29

        Dr. Irving Amron:  Count 13 and 19 (Livingston, New Jersey) 30

        Vickie Keel:  Count 14 (Gadsden, Alabama) . . . . . . . . . . . . 30

        George Bayer:  Count 17 (Sutton, Nebraska) . . . . . . . . . . . . 31

        Dr. Terry Nofziger: Count 20 (Paoli, Indiana) . . . . . . . . . . . . 32

II.    The District Court Did Not Err In Denying The Motion To Suppress

    Taped Telemarketing Conversations. . . . . . . . . . . . . . . . . . . . . . . . . . . 33

III.    The District Court Did Not Abuse Its Discretion In Limiting The

    Testimony Of Edward Hexter And Best Marketing Inc.'s Attorney. . . 44

Conclusion     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

iii

# Table of Citations

**Cases:**                                                                                      **Page:**

\* *Epps v. St. Mary's Hosp. of Athens,*

  802 F.2d 412 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, *passim*

*Royal Health Care Serv. Inc. v. Jefferson Pilot Life Ins.,*

  924 F.2d 215 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 41

*Sanders v. Robert Bosch Corp.,*

  38 F.3d 736 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*United States v. Anderton,*

  136 F.3d 747 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Bell,*

  678 F.2d 547 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Bertram,*

  805 F.2d 1524 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Brown,*

  40 F.3d 1218 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Brown,*

  79 F.3d 1550 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Camargo-Vergara,*

  26 F.3d 1075 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# Table of Citations
## (continued)

**Cases:**                                                              **Page:**

*United States v. deVegter,*

  198 F.3d 1324 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

\* *United States v. Eisenstein,*

  731 F.2d 1540 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Hayes,*

  40 F.3d 362 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Neder,*

  527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 28

*United States v. Petrie,*

  302 F.3d 1280 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Sanchez,*

  722 F.2d 1501 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Thayer,*

  204 F.3d 1352 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Vera,*

  701 F.2d 1349 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

\* *United States v. Yeager,*

  No. 02-11265, 2003 WL 1056598 (11th Cir. March 12, 2003) . . . . . . . . . . . 28

v

# Table of Citations
## (continued)

**Cases:**                                                              **Page:**

*United States v. Zapata,*

   139 F.3d 1355 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

*Watkins v. L.M. Berry & Co.,*

   704 F.2d 577 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

*Williams v. Poulos,*

   11 F.3d 271 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40


**Statutes & Other Authorities:**                                       **Page:**

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 23

18 U.S.C. § 2510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33, 37, 38

18 U.S.C. § 2511 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

18 U.S.C. § 2512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

18 U.S.C. § 2513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

18 U.S.C. § 2514 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

18 U.S.C. § 2515 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

18 U.S.C. § 2516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

18 U.S.C. § 2517 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

vi

**Statutes & Other Authorities:** (continued)                    **Page:**

18 U.S.C. § 2518 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

18 U.S.C. § 2519 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

18 U.S.C. § 2520 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

18 U.S.C. § 2521 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Fed. R. App. P. 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

**United States Sentencing Guidelines:**                    **Page:**

§ 5K1.1    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

## Statement of Jurisdiction

The jurisdiction of this Court is invoked under 28 U.S.C. § 1291.

## Statement of the Issues

Whether there was sufficient evidence to sustain appellant Hannibal Penney's wire fraud convictions.

Whether the district court erred in denying the motion to suppress taped telemarketing conversations.

Whether the district court abused its discretion in limiting the testimony of Edward Hexter and Best Marketing Inc.'s attorney.

## Statement of the Case

### 1.    Course of Proceedings and Disposition in the Court Below

On September 14, 2000, a federal grand jury returned a 31-count indictment against Hannibal Penney and four co-defendants, Edward Hexter, Mark Goldberg, Charlie Martin and Roby Dudley, charging all the defendants with one count of knowingly and intentionally conspiring to commit wire fraud, in violation of 18 U.S.C. § 371 (Count 1) and 30 substantive counts of knowingly and intentionally committing wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts 2 - 31) (R1:1). Penney was specifically charged in Counts 11 - 20 (R1:1). Hexter died in October of 2002, and the charges against him were subsequently dismissed (R1:116; R2:253). Goldberg and Martin entered into plea agreements with the United States (R1:37, 55), and following trial, the government filed substantial assistance motions

under USSG § 5K1.1 on their behalf (R2:183, 185).  Goldberg and Martin were sentenced to five years' probation (R2:218, 219).[1]

Prior to trial, Penney filed a motion to suppress tape recordings of Dudley's and his telemarketing telephone calls (R1:110, 121, 137).  The government opposed (R1:117, 130, 135), and the district court held a full day's evidentiary hearing (R4).  The district court denied Penney's motion to suppress (R2:165).

Penney moved to subpoena defense witnesses prior to trial, including attorney Sam Fields, lawyer for then deceased Edward Hexter and Best Marketing, Inc. (R1:89).  Attorney Fields filed an opposition under seal (DE:128), and the district court deferred ruling until the time of trial.

Penney and Dudley proceeded to trial.  At the conclusion of the government's case-in-chief, they moved for judgments of acquittal under Fed. R. Crim. P. 29 (R16:66).  The government responded, and the district court denied the motion (R16:82).  Penney moved again for a Rule 29 acquittal at the close of all the evidence (R17:148).  The district court again denied his motion (2SR1:4).  Following conclusion of the 15-day trial, Dudley was acquitted of all charges (DE2:176).  Penney was acquitted of the wire fraud conspiracy charge and four counts of

---

[1]    While Goldberg and Martin were only sentenced to probation, they received significant restitution judgments (R2:218, 219).  Goldberg was sentenced to $711,547 in restitution, and Martin was sentenced to $210,524 in restitution (*id.*).  Each was also sentenced to six months' home confinement (*id.*).

2

substantive wire fraud but found guilty of six counts of substantive wire fraud (DE2:177).

The district court sentenced Penney on October 31, 2002 to 10 months' imprisonment and 3 years' supervised release (R2:227). Basing Penney's fraud loss calculation solely on the counts of conviction, the district court ordered $6,802 in restitution and set a payment schedule for Penney once he was on supervised release (R2:227). Penney filed a timely notice of appeal on November 1, 2002 (R2:228).

## 2.     Statement of the Facts

### a.     Offense Conduct

From 1987 to July 1996, Edward Hexter operated a telemarketing boiler room named Best Marketing, Inc. (Best Marketing or Best) located at 4300 North University Drive, Suite D206, Lauderhill, Florida. Hexter was the president and controlling officer of Best Marketing (R6:16; R7:92). Hexter called his telemarketing operation an "advertising specialty" business because it sold products such as printed or embossed pens, key chains, magnets and caps imprinted with business and/or advertising text (R6:32). Best Marketing salespersons telephoned small business owners in small towns outside Florida, telling them that they had been selected to participate in a special promotion program (R6:18, 33; R7:94, 147). Sales were only made to out-of-state locations so the customers would not come to complain at Best's offices (R13:125). Best targeted small businesses in small towns because the people were more trusting, less sophisticated or knowledgeable about the products, and

3

Hexter believed that "you could get in a lot more trouble if you were lying to homeowners than if you were lying to businesses" (R7:94; R8:67; R13:125). Goldberg thought they were more "gullible" (R7:148). Hexter bought lead sheets with the names of customers from other boiler rooms, lead brokers, or lead services (R6:17, 99; R7:98, 99; R14:57). Hexter also provided his salespersons with a list of states that they were not supposed to call because the Attorneys General therein had accused Best Marketing of defrauding customers (R7:126). To avoid further trouble, Hexter entered into agreements not to call those states (R7:126; GX 1101; R8:58, 153).

"Fronters" made the initial calls and tried to make a sale of at least $500 (R6:17; R7:92, 107). Fronters were generally inexperienced salespeople (R6:18; R7:92). They would call customers and read them a sales script from a "pitch sheet" (R6:18). The pitch sheets contained fraudulent and misleading statements to entice customers to purchase advertising speciality items at inflated values (R7:100).

The fronters informed customers that they were eligible to receive one of a list of "premiums" or "bonuses" awarded to purchasers of certain advertising specialty items (R7:100). There was a "one in five" pitch and a "two in seven" pitch (R7:99). The one in five meant that you received one premium out of a list of five and the two in seven meant you received two premiums of a list of seven (R7:99). The customers were required to make a minimum purchase in order to qualify for one of the premiums. Fronters led customers to believe that the value of the advertising

4

specialty items combined with premiums exceeded the dollar amount of their purchases from Best Marketing (R7:96,106). In nearly every instance, the customer overpaid for what he received both in specialty items and premiums (R7:96, 106).

After the customers made an initial purchase, Best Marketing handed their names and telephone numbers to the more experienced "reloaders" who repeatedly tried to re-sell them (R6:18). Reloaders were seasoned salespeople who would attempt to get a resale of two up to two and a half times the original sale (R6:18; R14:58). Goldberg, Dudley, Martin and Penny worked at Best Marketing as reloaders and were among the most successful Best salesmen (R6:106, 125). These men were entrusted with difficult or potentially lucrative customers. Hexter instructed all salespersons to "sizzle up" the premiums or, in other words, make them sound more attractive than they were (R7:95, 100). In fact, Goldberg conceded that none of the premiums was worth what had been represented (R7:100).

Typically, the premium list included five items such as an automobile, vacation certificate, electronic equipment (camera, television or stereo), jewelry and a check for varying amounts. The salespersons implied that the least valuable premium was the item listed last, commonly the check (R7:115; R14:81). In truth, several of the items were worth substantially less than the check, and the customer was not guaranteed to receive any item of significant value. In most cases, the customer was awarded the least valuable item on the list, sometimes a nearly worthless vacation certificate which would require the customer's contribution of additional money

(R7:94). Goldberg referred to the vacation certificates as "breakage certificates" because customers never used them due to their difficulty and expense (R7:95; R8:97). Hexter paid $10 for them (R7:94). In the approximately seven years that Goldberg worked at Best Marketing, less than five automobiles were given away (R7:118).

All of the reloaders used various aliases with the customers.[2] Penney used aliases including, "Dr. Grant Maxwell," "Dr. Jim St. James," "Sky Tyler" and "Lincoln Green" (R7:125; GX Composite 60C, 68). Dudley used aliases including, "Ted Brown," "Ed White" and "Russ Walton" (R7:103). Both Penney and Dudley changed personalities in some cases when they changed aliases (R6:65; R7:103).[3] Hexter allowed reloaders to vary their sales presentations or pitches according to their skill and experience (R6:110). When the FBI seized the records of Best Marketing,

---

[2]     In fact, nearly every employee of Best Manufacturing used an alias including the owner, Edward Hexter, who frequently used the alias "David Best" (R7:92). Hexter allowed several other men to also use the "David Best" alias (R7:104).

[3]     Penney's telephone worksheet reflected that when he attempted to sell George Bayer as "Dr. Grant Maxwell" and was unsuccessful, Penney "went back in" as "Lincoln Green" (R6:62; GX Composite 65). The telephone worksheet contained a record of Penney's deceptions from April 12, 1996 through July 12, 1996 (*id.*), including a list of who he called, the telephone number at which Penney reached them, what personality he first used and then what personality he subsequently used, the costs of the premiums and shipping and the extended amount on which Penney could seek a commission (*id.*). It had numerous "CXL's" written on it along with notations such as "Barb said big problem," all in red (*id.*).

some of the pitch sheets included: "The Grand National Finalist," "The Corporate Pitch" and "The Rebuttals" (for when a customer started to balk) (R6:56, 57; GX Composite 65). Penney's files contained copies of various pitches he used, including: "The First Reload Pitch," "The Second Reload Pitch," "Rebuttals," "Security Code Confidential Pitch Spy Close" and "Self Close" (R6:61, 62; GX Composite 65, 66, 67, 68).

A typical reloader pitch included the misrepresentation that the customer had a "special status" in a Best Marketing promotion which made him more likely to win one of the most valuable premiums (GX Composite 65). During the time that he worked for Best Marketing, Penney frequently misrepresented to customers that he was the "Chief Executive Officer" (GX 13B:3) with up to "127 employees" (GX 19B:5) working for him and that the customer had been chosen as Best Marketing's "Businessman/Woman of the Year" (see, e.g., GX 12B:2; 14B:7). Penney told numerous customers that they had been specially selected because of their humanitarian deeds, and therefore, would be receiving Best Marketing's "Humanitarian Award" (GX Composite 65).[4] In addition to over representing his place in the company, Penney misrepresented the kinds of customers that Best had,

---

[4]     The Federal Bureau of Investigation (FBI) seized Penney's telephone worksheet which demonstrated that he had assured 93 out of 100 customers that they were either the Businessman/ Woman of the Year, had won the Humanitarian Award or some similar award (GX Composite 65). All of the customers who were in the counts of conviction were either recipients of the fictitious Businessman/ Woman of the Year, Humanitarian Award or state finalist (see GX Composite 46, 47, 48, 51, 53).

stating that Quaker Oats and Pepsi Cola were among Best's clients (GX 19B:17). Penney frequently made misrepresentations about the quality and nature of the advertising products, such as telling customers that they would be receiving "Mont Blanc" pens which retailed for over $200, although the Best Marketing pens were inexpensive imitations worth only $1.47 according to Best's internal order invoices (R7:15, 30; GX Composite 58, GX 520, 1114). While Penney often spoke of giving away Rolex watches worth $20,000 up to $30,000, the fact was that Best *never* once gave away a Rolex watch (R14:96-97). Occasionally Penney told his customers the exact premium they would be receiving, while leading them to believe that by making the current purchase, they would be getting a much more valuable premium "down the road."

Penney also plied his customers for personal information about their wives' preferences in jewelry and whether they were saving for their children's college tuition. He would then use this information against the customer by stating, for example, that the person would be eligible to win the "tuition award." Best did not have a tuition program (R14:97).

Hexter hired Goldberg as a fronter in early 1989 (R7:91, 92). Hexter hired Dudley in August of 1989, about the same time that Goldberg began working as a reloader. Best hired Martin in December of 1995 and Penney in January of 1996, both as reloaders (R7:108; R13:120). Martin and Penney had worked together at a

8

previous telemarketing boiler room, and Penney was a "seasoned" telemarketer (R7:110; R8:133; R13:121).

In order to maintain control of the salesmen, Edward Hexter and his son, David Hexter, listened to them on a telephone monitoring system (R6:23, 131). Hexter kept control of what the salespersons said through monitoring the telephone calls (R6:24, 26; R7:80; R16:161). Hexter was concerned the salespeople would "go too far" with the pitches (R16:161). Monitoring of telemarketing calls was a common practice in the business. The sales people were not allowed to use the term "prize," but instead used "premium" or "award" or "bonus" (R7:96). Best Marketing told the customers that they would receive a premium which was "randomly selected" from a computer list (R7:95, 100, 118). Among themselves, the sales people referred to the customers as "mooches," implying they were easily separated from their money (R7:122). Best Marketing had a "mooch wall" which contained pictures of customers who Best had asked to send photographs so they might be used in fictitious national promotions (R7:122).

All of Best Marketing sales personnel verbally assured customers, and their remarks were confirmed in subsequently mailed verification letters, that the premiums were "computer selected" (*see, e.g.,* R7:95, 134; GX Composite 46, 47, 48, 51, 58). Every Best Marketing witness at trial and the FBI-seized Best Marketing documentation confirmed that there was no random computer selection of awards (R7:95, 134; R16:165-66; GX Composite 46, 47, 48, 51, 53). The selection of

premiums was based on how much a customer purchased, not on a random computer selection (R13:133-34). As a customer spent more money, the premium was also more valuable but always a fraction of what was spent by the customer (R7:96, 100, 105; R13:133; GX Composite 66). When a major premium was given, it was to a customer hand-picked by Hexter (R7:100).[5] The actual value of the merchandise was the smallest fraction of the purchase price (R7:107; GX 520, 1114). Reloaders were required to purchase all premiums from Edward Hexter at inflated prices, a minimum of 50% more than the actual cost and sometimes 100% up to 150% increase (R7:25, 128; R13:131). Hexter also charged reloaders a $100 shipping charge regardless of the size or quantity of the award (R7:129; R13:132; GX Composite 46, 47, 48, 51, 53).[6]

Reloaders earned between a 30% and a 33% commission based on the total amount spent by the customer, minus the inflated price of the award, the minimal cost of the merchandise and the shipping costs (R7:39, 42, 129-31; R8:159; R13:132; R14:70). This difference was the "extended" price listed on a sales order form

---

[5]    The only exception to this was when Hexter allowed Goldberg once to choose the recipient of a cash award (R7:96). This still remained largely in Hexter's control because he chose the salesperson and dictated the standards for choosing the recipient (*id.*). The few vehicles that were given out were nearly always given to customers who had spent large sums of money with Best Marketing (R7:96; R8:160).

[6]    The costs of premiums were inflated because it gave higher profits to Edward Hexter (R7:43). The same was true of the shipping costs at a flat $100 no matter how inexpensive the shipping costs (R7:129).

(R7:42, 129, 131; R14:70; GX Composite 46, 47, 48, 51, 53).[7] The sales order form also included the salesperson's name and the customer's name, address and telephone number (R7:127-31; *see* GX Composite 46, 47, 48, 51, 53). Goldberg testified that he made over $1,100,000 during the seven years he worked at Best Marketing (R7:158). That would have been on a volume of $6,100,000 in sales for Best (*id.*). By taking the seized sales order forms and backtracking to the salespersons and dates, the FBI matched audio tape recordings to specific sales (R6:27).

Reloaders kept index cards on the customers (R6:59; GX Composite 66, 67, 68). The index cards contained contact and personal information and a record of previous sales (R6:59; R13:127, 128; GX Composite 67, 68). If a customer declined to make a purchase, the reloaders would frequently call back using a different name and voice (R13:139; GX Composite 65, 66, 68). They kept track of these impersonations on the index cards maintained for each customer (R13:139-40; GX Composite 66, 67, 68). If the customer still did not purchase, then Hexter would recycle the lead by giving it to another reloader (R14:58).

After a customer agreed to a purchase, the salesperson filled out the sales order form and it was taken to another Best employee who would "verify" the sale (R7:127, 134; *see sales order forms inside* GX Composite 46, 47, 48, 51, 53). Barbara Kelly, who used the telephone alias of "Robin Davis," handled nearly all of the verification

---

[7]     For the Court's convenience, an example of a sales order form is attached as Appendix A.

11

calls (R6:78, 102, 114; R7:134). She told the customers that she was verifying their purchase and sought permission to tape record the verification (R6:78, 114; R7:135). She would repeat the purchase and repeat the premiums offered but without any intimation that a customer would receive any check or premium over any other premium (R6:33, 80; R7:135).[8] She confirmed credit card numbers, spellings and the other order information (R6:33, 114). She assured the customers that the premium would be "computer selected" (R7:134; R8:84, 85). A verification letter was also sent which confirmed that certain specialty items had been purchased; the customer was eligible to receive one (sometimes more) premium from a list of premiums; and the premium would be "computer selected" (R6:103, 114; R7:132; *see verification letters inside* GX Composite 46, 47, 48, 51, 53). The premium, however, had already been preselected by the salesman based on the total amount of the sale (R14:60). Customers were instructed to sign and return the verification letters (R6:87; R7:132-35; R14:63-64).[9] These letters were often faxed back (GX Composite 46, 47, 51, 53) or sent by Federal Express back to Best (GX Composite 48). While the credit card company was immediately notified as soon as the sales order form was filled out, and

---

[8]     The tapes revealed that Penney anticipated this discrepancy between what he promised and what Robin Davis represented because he repeatedly told his customers, "make this easy on Robin Davis, when she calls, say no more or any less than what I have authorized you and asked you to say" or "keep this simple with her" (*see* GX 13B:23, 27).

[9]     For the Court's convenience, a copy of a verification letter is attached as Appendix B.

ATM cards were debited immediately (R8:87), the sale did not go through as final until the authorization letter was signed and returned to Best (R6:87; R8:86).

When a customer complained that his premium was not what had been promised by the sales person, Best Marketing used the verification call and the confirmation letter to oppose a charge back. If a customer complained too strongly, his customer file was marked "red," and no more calls were made to him (R7:120). At one point, Goldberg asked Hexter if he would defend him if the telemarketing was "illegal" (R8:59, 64).

### b.    Testimony and Tapes Recordings From Six Victims[10]

Penney made multiple misrepresentations in his attempt to impress the customers that they were special and were very likely to receive extraordinary premiums. Without quoting the entire conversations, the following are misrepresentations contained in the various telemarketing sales.

### Mike Carey:  Count 12

Carey owned a radio station in Mount Pleasant, Michigan (R15:4-5).

---

[10]    For the Court's convenience, the six transcripts of the recordings are attached as Appendices C through H. Simultaneously with the filing of the government's brief, the United States will move to reenter the trial and suppression exhibits into the record on appeal.

The following are some the lies that Penney used to persuade Carey to purchase:

- that Penney was a Best Marketing Chief Executive (GX 12B:5, 9)[11]

- that Carey had received Best's Businessman of the Year Award (GX 12B:2)

- that Carey stood to win a Chrysler automobile, Rolex watch worth $20,000 to $30,000 (or Croton or Lucien Piccard), a Jeep, a home stereo system, Bahama vacation, Pentium IBM computer, a big screen television or $2,500 in cash (GX 12B:2, 3)

- that Penney was crediting $5,000 to Carey's account as though Carey had spent that amount toward the fictional premiums (GX 12B:2)

- that the pens Carey was purchasing were Mont Blanc (GX 12B:4, 6, 9)

- that Best Marketing dealt with companies like Pepsi Cola (GX 12B:7)

On Carey's Count 12 purchase of $1,499.95, the actual value of his premium and advertising special product was $274.37 (*see* GX 520, 1114).

### *Dr. Irving Amron: Counts 13 and 19*

Dr. Amron was a 81-year-old semi-retired chemist from Livingston, New Jersey who owned Amron Consulting Service (R9:91). His wife was an "invalid" (GX Composite 66). Her invalid status, along with her name, "Bernice," was written on Penney's Amron index card (GX 13B:22; GX Composite 66). On tapes for March

---

[11]     Penney also said that he had a Ph.D. in communications from Yale University (GX 12B:11). In fact, this was closer to the truth than many of Penney's representations because Penney had a 1973 Masters Degree from Yale University in communications, speech and drama (Revised PSI at ¶ 56). His undergraduate degree was in drama and English from Morehouse College (Revised PSI at ¶ 55).

14

26, 1996 (Count 13) and May 29, 1996 (Count 19), Penney referred to Best Marketing's desire to help "senior citizens" such as Dr. Amron (GX 13B:11; GX 19B:3). Dr. Amron's inability to manage his financial affairs was pathetically highlighted in both taped conversations where he begged Penney, disguised as Dr. Jim St. James, not to sell him any more specialty products because Dr. Amron was in such financial difficulty (GX 13B:4-13; GX 19B4-9). Goldberg testified that "In many cases [the customers] were buying stuff they couldn't afford" (R7:136).

The May 29, 1996 tape (Count 19) reveals Best Marketing's practice of calling a person's credit card to determine his credit limit before making a sale and then "blocking" that amount for a limited period from further charges (R14:59). Apparently Dr. Amron knew he had only a limited credit line and was saving it for an emergency. Penney proceeded to make yet another sale to Dr. Amron and use up the elderly man's only reserve of credit (GX 19B). The following are some of the lies Penney used to help persuade Dr. Amron to purchase:

- that Dr. Amron was in a "unique" situation to win a Chrysler automobile or a Rolex watch (GX 13B:2)

- that Dr. Amron was guaranteed to receive a Rolex, a Chrysler, a computer "with all the extras," or $5,000 (GX 13B:2, 6, 7, 11)

- that Penney was crediting $2,000 to Dr. Amron's account as though Dr. Amron had spent that amount toward the fictional premiums (GX 13B:6, 11)

- that Penney was promising Dr. Amron that at the end of Best's fiscal year Dr. Amron would have $10,000 as a premium – at least six times on one tape Penney guaranteed Dr. Amron that he would win one of the top awards (GX 13B:6, 7, 9, 11, 14, 24)

15

- that Dr. Amron was a "state finalist" (GX 13B:16)

- that the pens Dr. Amron was purchasing were Mont Blanc (GX 13B:14, 28, 31)

- that Best Marketing dealt with companies like Quaker Oats and Pepsi Cola (GX 19B:17)

- that Penney had 127 Best Marketing employees working for him in what was a multi-million dollar promotion (GX 19B:5)

Penney concluded by telling Dr. Amron that he should not "embarrass" Penney by telling Robin Davis about the "strings" Penney had pulled for him (GX 13B:21). He repeatedly told Dr. Amron to make it "easy" and "simple" for Robin Davis when she called by going along with whatever Ms. Davis said (GX 13B:27). What Penney and Dr. Amron had said was just "between me and you" (GX 13B:28):

> When you talk to Robin Davis, I'd appreciate it greatly if you wouldn't mention the fact that I have put this into your account to make it appear that you have 100 grand here, just to be able to make you appear that you're a big time buyer ah . . . please don't mention to her that the 3,000 dollars that required on the 5,000 dollar ah . . . Order was picked up by ah . . . our business department, that was very generous of 'em, so if you could be your beautiful charming smiling self and thank her and ah . . . make it easy for her . . . .

(GX 19B:12).

At trial, Dr. Amron believed a Rolex watch was what Penney had "discussed in the [March 26, 1996] telephone conversation" (R9:99), and consequently, Dr. Amron had edited his first verification letter to reflect that understanding (R9:99; GX Composite 47).

16

On Amron's Counts 13 and 19 combined purchases of $3,498.99, the actual value of his premiums and advertising special products was $642.11 (*see* GX 520, 1114).

### *Vickie Keel:  Count 14*

Vickie Keel owned two video rental businesses, one in Boaz, Alabama, and the other in Fort Payne, Alabama (R11:108). She lived in Gadson, Alabama (R11:108). She said that "St. James" called her several times from Best Marketing (R11:109-10). Penney led her to believe that Best was having a promotion in which if she bought some advertising items, she could win a Rolex, a pickup, A Tiffiny tennis bracelet or a pool table (R11:109-10). Keel insisted that Penny "guaranteed" that she would win one of the top premiums (R11:111; R12:5, 22). She received an eight by ten photograph of Terry LaBonte, some steaks and some candy (R11:111).

The following are some of the lies that Penney told Vickie Keel in order to persuade her to purchase Best specialty items:

- that Penney was crediting $1,000 to Keel's account as though Keel had spent that amount toward the fictional premiums (GX 14B:2)

- that Keel stood to win an automobile "along with about five or ten thousand dollars" in Best Marketing's Tenth Anniversary Contest - Penney twice guaranteed Keel that she would win one of the top awards (GX 14B:2, 7)

- that Keel was Best Marketing's Businesswoman of the Year (GX 14B:7)

- that because Keel was so special, Penney was sending her steaks as a bonus (GX 14B:8)

17

At the time of Penney's March 27, 1996 call, Keel was undergoing medical treatment which preoccupied her, and Penney proceeded to offer her medical advice. He also asked Keel not to cause trouble with Robin Davis' verification of the sale (GX 14B:12).

On Keel's Count 14 purchase of $799.95, the actual value of her premium and advertising special product was $171.61 (*see* GX 520, 1114).

### *George Bayer: Count 17*

George Bayer was an accountant from Sutton, Nebraska (1,400 people) (R13:72, 73; GX Composite 51). In May of 1996, "Dr. Grant Maxwell" convinced Bayer to purchase some Mont Blanc pens (R13:80).

The following are some of the lies that Penney told Bayer:

- that Bayer was Best Marketing's Businessman of the Year in the Tenth Anniversary Promotion (GX 17B:7, 13)

- that Bayer would be a major bonus recipient of a Lincoln automobile, $35,000 Chrysler, a Jeep, full-size fishing boat, antique style rolltop desk, $10,000, Bahamas vacation, or $20,000 to $30,000 Presidential Rolex with matching diamond ring (GX 17B:3, 8)

- that Bayer was guaranteed to win one of the top awards (GX 17B:6)

- that the pens Bayer was purchasing were Mont Blanc (GX 17B:8, 13)

On Bayer's Count 17 purchase of $999.95, the actual value of his premium and advertising special product was $267.64 (*see* GX 520, 1114).

18

### *Dr. Terry Nofziger: Count 20*

Dr. Nofziger was a family physician from Paoli, Indiana (3,500 people) (R14:24). Dr. Nofziger had purchased advertising from Best Marketing for several years because Best represented that the doctor stood a special chance to win a top premium (R14:25-27) ("one of the two or three remaining businessmen who were in the running"). Dr. Nofziger thought that there would be a "car . . . in [his] driveway in ten days" (R14:30). Dr. Nofziger received a "useless" oak rolltop desk (R14:29). Dr. Nofziger concluded that he was too "trusting" (R14:42). The following are some the lies that Penney used to persuade Dr. Nofziger to purchase specialty items:

- that Penney was Best Marketing's "Chief Executive" (GX 20B:2)[12]

- that Dr. Nofziger had received Best Marketing's Businessman of the Year Award (GX 20B:2)

- that Dr. Nofziger stood to win a Chrysler automobile, GMC pickup truck, Presidential Rolex watch with matching diamond ring that sold for $20,000 to $30,000, a full-sized, two-seater bass fishing boat, 17th Century style grandfather clock, a luminite desk, or $5,000 cash (GX 20B:2, 4)

- that someone had failed to inform Dr. Nofziger he was a recipient of one of these premiums if he had only purchased the second half of his prior order (GX 20B:2, 3)

- that Dr. Nofziger was the winner of one of the vehicles - Penney referenced Dr. Nofziger's receipt of a vehicle ten times (e.g., "we intend to get this either in your driveway, in your hands, uh, in your possession in the next ten days;" "you had the car" [supposedly in a previous promotion]) (GX 20B:3, 4, 5, 6, 7)

---

[12]    Penney also assured Dr. Nofziger that Penney was a Yale Ph.D. in communications (GX 20B:3).

- that Dr. Nofziger was the state finalist for Indiana (GX 20B:4)

- that the pens Dr. Nofziger was purchasing were Mont Blanc Ambassador pens (GX 20B:6)

On Dr. Nofziger's Count 20 purchase of $1,699.95, the actual value of his premium and advertising special product was $340.35 (*see* GX 520, 1114).

c.    *Defense Case*

Dudley and Penney did not testify. They called six witnesses on their behalf (R16:84-175; R17:8-117). Their first witness was William Estrella, a satisfied customer of Dudley (R16:84-93). They also called Jay Coulter, another satisfied customer of Best Marketing, who had received a Pontiac Grand Am in 1994 (R16:99). Finally, Dudley and Penney called David Hexter, son of the deceased owner of Best Marketing, Edward Hexter (R16:102). David Hexter identified various employees of Best Marketing and testified to what their positions in the firm had been (R16:101-175).

On cross-examination, David Hexter confirmed that Penney was not the Chief Executive Officer, could not credit accounts to make it appear that customers had spent more than they actually had, did not have a Board of Directors who responded to Penney, and did not have 127 people working under Penney (R16:161). He also confirmed that premiums were not computer selected (R16:165-66). He admitted that the statement regarding random computer selection of premiums in Best Marketing's verification letter was false (R16:166).

20

Leslie Goldberg, Mark Goldberg's wife, testified that she wrote up orders for her husband at Best Marketing, and admitted on cross-examination that customers had been told lies (R17:21). Barbara Kelly (Robin Davis) explained how she verified sales for Best, and on cross-examination, admitted that customers had not been told the truth (R17:22-67). When asked if there was random selection of premiums, she replied, "No, it [selection] took place, obviously, before when the order was placed [by the salesperson]" (R17:46-48). Finally, attorney Sam Fields testified about his firm's relationship with Hexter and Best Marketing (R17:68-117).

### 3.   **Standards of Review**

Issue 1.    Sufficiency of the evidence is a legal question reviewed *de novo*. *United States v. Thayer*, 204 F.3d 1352, 1354 (11th Cir. 2000) (citing *United States v. Ramsdale*, 61 F.3d 825, 828 (11th Cir.1995)). The evidence, however, must be viewed in the light most favorable to the government. *United States v. Camargo-Vergara*, 26 F.3d 1075, 1078 (11th Cir. 1994).

Issue 2.    Rulings on motions to suppress evidence involve mixed questions of law and fact. In considering a motion to suppress, the Court reviews factual findings for clear error and the application of the law to the facts *de novo*. *United States v. Anderton*, 136 F.3d 747, 749 (11th Cir. 1998).

Issue 3.    The district court's exclusion of evidence on grounds of attorney-client privilege is reviewed for an abuse of discretion. *United States v. Hayes*, 40 F.3d 362, 364 (11th Cir. 1994).

21

## Summary of the Argument

Issue 1.    There was more than sufficient evidence that Penney was involved in a scheme to defraud which involved active misrepresentations or lies to induce people to purchase advertising specialty items at highly inflated prices in the false hope of winning valuable awards or premiums. Penney also lied about what he was selling the customers, representing that he was selling Mont Blanc pens, for example, when they were cheap imitations. There was overwhelming evidence that all of the telephone calls were to out-of-state customers.

Issue 2.    The district court properly denied the suppression of the taped telemarketing calls because they met both prongs of the business extension exception of Title III.

Issue 3.    Penney cannot qualify for a defense of good faith reliance on advice of counsel because attorney Fields was never his attorney. Moreover, Penney never attempted to meet the evidentiary predicate for this defense which would have been a full disclosure to the attorney of all the material facts. Therefore, the district court's exclusion of the substance of Fields' attorney-client discussions with deceased Edward Hexter was not an abuse of discretion.

## Argument

I.    **The Evidence Was Sufficient To Support Penney's Wire Fraud Convictions.**

Penney challenges the sufficiency of the evidence in support of his convictions for wire fraud (Br. at 21). His challenge is without merit.

The wire fraud statute, 18 U.S.C. § 1343, provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, [or] representations . . . transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned . . . .

The Supreme Court has decided that materiality is an element of wire fraud pursuant to § 1343. *United States v. Neder*, 527 U.S. 1, 25 (1999).

The court's instructions to the jury, which Penney did not challenge, instructed that he could be found guilty of wire fraud if: (1) he knowingly devised or participated in a scheme to defraud, or for obtaining money or property by means of false statements, pretenses, representations or premiums; (2) the false statements, pretenses, representations or promises were material; (3) the false statements were made willfully and with an intent to defraud; and (4) transmitted or caused to be transmitted by wire in interstate commerce for the purpose of executing the scheme to defraud (R2:175). *See United States v. deVegter*, 198 F.3d 1324, 1328 n.4 (11th Cir. 1999).

23

The evidence will be viewed as legally sufficient if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (Unit B, *en banc*); *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir. 1983). The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. *United States v. Sanchez*, 722 F.2d 1501, 1505 (11th Cir. 1984). The jury must be presumed the latitude to "choose among reasonable constructions of the evidence." *United States v. Bertram*, 805 F.2d 1524, 1531 (11th Cir. 1986).

Penney challenges the sufficiency of the evidence with respect to the intent element of the wire fraud offenses and the proof of an interstate nexus (Br. at 21-27). In this regard, he asserts that "[w]hat [he] said [on the telephone sales] does not reach the level required for criminally actionable fraud under the statute" (Br. at 23) and the circumstantial proof of the locations of the five victims when Penney telephoned them is likewise insufficient (Br. at 21). Penney maintains that "They knew what they were buying and that is exactly what they got" (Br. at 27).

### A.    *Proof of Scheme to Defraud*

Penney joined and executed a scheme that involved active misrepresentations and lies to induce five victims to purchase advertising specialty items at highly inflated prices in the false hope of winning expensive premiums. The entire scheme at Best Marketing was calculated to defraud the customers. The salesmen, who used aliases, and often multiple aliases with different personalities, induced customers to

24

buy a chance to win an expensive premium that, more often than not, did not exist. Moreover, there was no random computer selection of premiums. Every salesperson chose the premium or premiums that would be awarded to the customer based on the total amount of the purchase.  The sales order forms which were filled out immediately and sent to Barbara Kelly (Robin Davis) for her verification process indisputably proved this.  In fact, not one piece of evidence at trial refuted the fact that premiums were deliberately chosen.  Even defense witness David Hexter confirmed there was no computer selection of premiums.

Customers were made to feel special as winners of the fictitious Businessman/ Woman or Humanitarian of the Year awards when nearly every customer was a recipient of such an award.  Penney in particular represented himself as the Chief Executive Officer of Best with "127 employees" working for him.  When a customer was told of the customer's special status, that he was being telephoned by the Chief Executive Officer and assured of being the recipient of one of the top awards, he had no way to confirm the truth of these representations.  The fact that Best Marketing did not sell advertising items to large corporations like Quaker Oats and Pepsi Cola was not something that he could determine. Whether an additional amount of purchases was being credited to the customer's account was also not something that he could determine.  The fact that Best Marketing had never given away a Rolex watch as a premium was also beyond his ability to determine. While every Best Marketing

employee understood the nature of the scheme to defraud, no customer had the inside knowledge nor a method to confirm the veracity of Penney's representations.

Penney argues that each of the five victims in the counts of conviction knew what he was buying (Br. at 27). The transcripts of Penney's conversations with the victims are attached. Not only do the transcripts demonstrate the lies set forth in the offense facts, but they demonstrate that the victims did not know what they were buying. Four of them thought they were buying Mont Blanc pens which was totally false. All of them thought they stood a chance to win a top award but, in fact, not one of them had any chance. At trial they reconfirmed that they thought they stood a chance to win. The fraud is not that they were charged outrageous prices for cheap pens but that they were told they were getting one thing and got another; they were induced to make purchases because of a chance to win something when there never was any chance to win. In fact, part of the scheme was for experienced telemarketers like Penney (reloaders) to sell the same victims multiple times.

Penney argues, on the other hand, that many were repeat customers (Br. at 27). The fact that Penny had previously defrauded the customers does not exonerate him for the fraud in the offense conduct. Penny also argues that the misrepresentations and lies that he told his customers fit within the "puffing" and "seller's talk" that are not actionable under the mail fraud statute (Br. at 25). *See United States v. Brown*, 40 F.3d 1218, 1221 (11th Cir. 1994) (citing *Belk v. United States*, 868 F.2d 1208, 1211 (11th Cir. 1989) ("The wire fraud statute tracks the language of the mail fraud

26

statute . . . . The statutes are given a similar construction and are subject to the same substantive analysis.")).

Penney bases his argument on *United States v. Brown*, 79 F.3d 1550 (11th Cir. 1996).[13] In *Brown*, 79 F.3d 1550, 1559, this Court held that:

> A "scheme to defraud" under the pertinent criminal statute has not been proved where a reasonable juror would have to conclude that the representation is about something which the customer should, and could, easily confirm – if they wished to do so – from readily available external sources.

It is apparent that this case does not fit within that model. In *Brown*, the Court held that a person of ordinary prudence about to enter into a purchase agreement for a home in Florida from a housing developer was not required to rely exclusively on the developer's own affirmative representations about the value or rental income of the house, because the factual basis of representations was subject to quick and easy verification by the buyer. Therefore, there was no scheme to defraud within the meaning of the federal fraud statutes based upon the "puffing" of the sales item's value. *Brown*, 79 F.3d at 1561. The Court reasoned that the customer could easily have confirmed whether the house was worth the purchase price from other external sources. *Id.* The Court emphasized that the customers received the quality of homes that the developer represented it was selling. 79 F.3d at 1556, 1562. They had simply been overcharged.

---

[13]    The government believes that the *Brown* citation in Penney's Brief at 24 is intended to be 79 F.3d 1550.

The holding of *Brown*, however, has recently been limited in *United States v. Yeager*, No. 02-11265, 2003 WL 1056598 (11th Cir. March 12, 2003). In *Yeager*, the Court overruled *Brown* insofar as mail (or wire) fraud requires proof that "a reasonable person would have acted on the [defendant's false] representations." *Yeager*, No. 02-11265, 2003 WL 1056598 , at *3. The Court explained:

> Proof of reliance by the victim on the false representations of the defendant, though necessary to prove common-law fraud, has no place in prosecutions for federal mail fraud. *Neder v. United States*, 527 U.S. 1, 24-25 (1999).

*Id.*

There is no doubt that the government met the more stringent standard of *Brown*, but certainly the Yeager standard was more than met. Here, it was not the highly inflated price of the advertising specialty items that formed the foundation of the fraud but the lies about what was being sold and the lies about the customer's chance to participate in winning a valuable premium. These misrepresentations were not susceptible to quick and easy verification. Moreover, the items sold were simply not as represented.

Determinations of whether a given device or artifice is actionably false or misleading is a question entrusted to the trier of act. Indeed, a properly instructed jury of ordinary citizens is the best means for ascertaining what is or what is not deceptive. The jury found against Penney on the scheme to defraud and its verdict should stand.

### B.    Proof of Interstate Nexus

There was overwhelming proof that all of Best Marketing's telemarketing sales were made to customers in other states. Goldberg and Martin testified that Best Marketing only called out-of-state small businesses because Hexter did not want customers to come in complaining (R13:125). All of the sales order forms, index cards, transcripts and shipping order forms confirmed that Penney was selling advertising specialty items to out-of-state customers. In addition to the general testimony and supporting government exhibits, each of the tapes and transcripts demonstrated that Penney was selling to an out-of-state customer.

### _Mike Carey:  Count 12 (Mount Pleasant, Michigan)_

Carey owned a radio station, WMMI AM/FM, in Mount Pleasant, Michigan in 1996 (R15:4-5). He received calls there from a Best Marketing salesman, "Jim St. James" (R15:5; GX 12B:2 ). Carey also received a letter from Best Marketing dated February 16, 1996, at the Mount Pleasant address (R15:6-7; GX Composite 46). The facsimile leader at the top of the letter faxed back to Best shows area code 517-773-5000 on February 16, 1996 from WMMI AM/FM (GX Composite 46). The Best Marketing letter starts, "As per your telephone conversation . . . I just wanted to thank you for participating . . . ." (GX Composite 46). Carey had faxed the document back to Best from Michigan.

The February 16, 1996 transcript begins, "Good morning, WMMI." (GX 12B:2). Later, Carey states, "Would it be possible to have WMMI-WCZY [imprinted

on the advertising] instead of Central Michigan Communications?" (GX 12B:9). In the same transcript, Penney states, "I certainly have said a lot of wonderful things about you and . . . the boys out there and Mount Pleasant" (GX12B:12).

### *Dr. Irving Amron: Count 13 and 19 (Livingston, New Jersey)*

Dr. Amron worked at Amron Consulting Service in Livingston, New Jersey (R5:91-92; GX Composite 47). Penney called him twice in Livingston, once on March 26, 1996 and again on May 29, 1996 (GX 13B; GX 19B).

Robin Davis verified the sales with Amron Consulting Service in Livingston, New Jersey (GX Composite 47). Best Marketing's records showed a fax number of 201-992-0533 on the sales order form as well as on the Best Marketing verification letters dated March 27, 1996 and May 30, 1996 (GX Composite 47). In addition, the sales order form for May 29, 1996 indicates Dr. Amron's address is Livingston, New Jersey (GX Composite 47). The verification date, in a different ink, on the same company form, is May 30, 1996, the same date as the fax verification letter (GX Composite 47).

### *Vickie Keel: Count 14 (Gadsden, Alabama)*

Keel owned two business in 1996 in Alabama, one in Boaz, Alabama, and one in Fort Payne, Alabama (R11:108). When Penney called Keel on March 27, 1996, he asked her, "What's your address there sweetheart?" Keel answered, "3001 Samson Avenue . . . Gadsden, Alabama" (GX 14B:9). When Keel gave the addresses to be

imprinted on her advertising items, she stated that her company, Movie World, was located at 210 East Mann Avenue, in Boaz, Alabama (GX 14B:12-13).

Best Marketing's business records had a verification of Keel's purchase on March 27, 1996 with a buyer's address of Gadsden, Alabama (GX Composite 48). The bottom right corner of the sales order form has the notation "Fed X" next to Barbara Kelly's verification note (GX Composite 48).

### *George Bayer:  Count 17 (Sutton, Nebraska)*

In Penney's (Dr. Grant Maxwell) call to George Bayer, Penney states, "Do us a courtesy of allowing us to fly you in here to Florida and . . . either get your car, your boat, or your exchange from here . . . allow us the courtesy to come out there and take our publicity shots as your favorite local dealership in . . . the Sutton, Nebraska area" (GX 17B:10). Penney later asks Bayer, "When are you coming down here?" and then says, "Can we get you down here for a Saturday or Sunday . . you've gonna promise . . . you can give me a little, good old Nebraska fresh air" (GX 17B:17).

Bayer said he received a telephone call from Best Marketing at his accounting workplace in Sutton, Nebraska (R13:73). The fax-line on the verification letter indicates that it was faxed from "Sutton Co-Op Grain Co." fax number 402-773-5672 on May 8, 1996 (GX Composite 51). The bottom right corner of the sales order form indicates "Fax" next to Barbara Kelly's verification note (GX Composite 51).

listen in on conversations, Hexter would dial a particular code on a box installed in his office which would give him access to monitor selected telephone extensions, either through a single line telephone or a speaker phone also installed in his office (R2:165:2; R4:19).

Jeffrey Porter, an employee of Global Communications, Inc., and employee of Best Marketing at the time of the installation, also testified that he serviced the business telephone system at Best Marketing (R2:165:3; R4:38-39). Porter testified that he installed a recording device at Best Marketing, known as a "Call Logger," which recorded up to twenty telephone extensions at the same time (R2:165:3; R4:39; SH GX 5, 10). The Call Logger dated and time-stamped those recordings, allowing a person to "zoom in" on any recording made at any particular time (R2:165:3; R4:41). Porter connected the Call Logger to the extensions in the mainframe console or "phone closet "(R2:165:3; R4:41-42).

Goldberg, Martin and David Hexter testified that as a general matter, the telephone salespersons at Best Marketing were aware that Hexter monitored telephone calls and that Hexter would use the monitoring as a way to train and supervise his employees or to suggest modifications to their "sales pitches" (R2:165:3; R4:62-64, 103-05, 118-20). Goldberg said the Best Marketing employees were told when they started work there that their telephone conversations were

35

monitored (R4:64).[18] Hexter wanted to make sure that salespersons were not telling "blatant lie[s]" (R4:63).

Hexter came to see Goldberg on more than one occasion to say, "Mark, you went too far on that sale. I want you to eliminate such and such words from your pitch" (R4:66). Goldberg also heard Hexter say the same thing to Penney on several occasions (R4:66). In fact, Hexter chastised Best Marketing employees on multiple occasions within listening distance of other employees about pitches which he had monitored (R4:66). Goldberg said that he knew Hexter recorded him on a former recording device and Goldberg protested to Hexter (R4:67-68). Later, when Best Marketing grew much larger and took in multiple employees from another telemarketing business, Goldberg believed that Hexter increased his taping capacity because he was attempting to maintain control of many more employees (R4:72). Goldberg said, however, that he did not know about the more extensive Call Logger (R4:70).

The district court found that while it appeared the monitoring of telephone calls was well-known to sales people at Best Marketing, the salespersons, including Penney and Dudley, were unaware that their telephone calls were being recorded, and

---

[18]     Goldberg not only said that Penney knew he was monitored, but it is apparent Penney knew because on the Amron March 26, 1991 tape (Count 13), Penney twice refers to the fact that someone may be "monitoring" the call (GX 13B:3, 6) ("Well, I know they're always monitoring these lines you know quality control").

it did not appear that either Penney or Dudley had expressly consented to these recordings (R2:165:3).

In order to establish that an intercepted wire communication violates Title III, the aggrieved party must demonstrate that (1) the conversations were "wire communications;" (2) the communications were "intercepted" within the meaning of Title III; and (3) the interceptions do not fall within a statutory exception for certain business telephone interceptions.

Title III defines "wire communication" as follows:

> [A]ny aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception . . . furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce . . . .

18 U.S.C. § 2510(1).

It is undisputed that the telephone conversations were "wire communications," as they were made in whole or in part through the use of a facility for the transmission of communications by the aid of wire, cable, or other like connection, specifically the office-wide telephone system installed at Best Marketing. Therefore, there is no disagreement that the conversations which were made over the Best Marketing telephone system were "wire communications" within the meaning of Title III.

Title III defines an "interception" as follows:

> [T]he aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical, or other device.

18 U.S.C. § 2510(4). Title III provides that devices may constitute an "electronic, mechanical or other device," as follows:

> [A]ny device or apparatus which can be used to intercept a wire, oral or electronic communication *other than - - -*
>
> > (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) *furnished to the subscriber or user by a provider of wire or electronic communications service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business . . . .*

*See* 18 U.S.C. § 2510(5)(a)(i) (emphasis supplied).

Thus, as the district court held, under the terms of Title III, there is no interception, and no violation, if the aural acquisition is through the use of telephone equipment furnished and used in the ordinary course of business (R2:165). This statutory exception is the "business extension exception," which is well-established in the Eleventh Circuit. *See Royal Health Care Serv. Inc. v. Jefferson Pilot Life Ins.*, 924 F.2d 215 (11th Cir. 1991); *Epps v. St. Mary's Hosp. of Athens*, 802 F.2d 412 (11th Cir. 1986); *Watkins v. L.M. Berry & Co.*, 704 F.2d 577 (11th Cir. 1983).

Penney makes a cursory argument that it was the Call Logger alone that intercepted his telephone calls and not the Best Marketing telephone extensions (Br.

38

at 32). The district court relied on this Court's decision in *Epps v. St. Mary's Hosp. of Athens*, 802 F.2d 412 (11th Cir. 1986), to determine which telephone equipment "intercepted" the Best Marketing conversations. In *Epps*, the hospital installed a recording device to the dispatch console into which emergency calls were made. A separate telephone line, used by employees, was also connected to the dispatch console. *Epps*, 802 F.2d at 413. Conversations on this separate telephone line were not recorded as a matter of practice. *Id*. However, while two employees were speaking on that separate telephone line, a third employee recorded them making disparaging remarks about a supervisor. *Epps*, 802 F.2d at 413-14.

The Court rejected the argument that the electronic or mechanical device used for interception was the recording equipment at issue in that case. As the Court stated, "[w]e believe the intercepting device was the dispatch console. The console intercepted the call. The double reel recorder recorded it." *Epps*, 802 F.2d at 415. Thus, the Court concluded that the dispatch console was a "telephone or telegraph instrument, equipment or facility" within the meaning of the business telephone extension exception, and affirmed summary judgment for the hospital on the Title III claims made by the employees. Similarly, in *Royal Health*, the Court rejected the argument that an interception was made by the recording device at issue in that case. The Court stated, "[w]e believe the telephone extension intercepted the call, while the tape recorder recorded it." *Royal Health*, 924 F.2d at 217 (citation omitted).

39

Here, the device used to intercept the conversations was also the mainframe console, or rather, the telephone extensions connected to the mainframe console. As the testimony of Eckland and Porter indicated, the service observation unit and the Call Logger were each connected to telephone extensions that ran from the mainframe telephone system. Thus, it was the telephone extensions that made possible the interceptions of telephone conversations between Best Marketing employees and others, and not the Call Logger. The Call Logger was the recording device, and not the intercepting device.

Penney relies on *Sanders v. Robert Bosch Corp.*, 38 F.3d 736 (4th Cir. 1994), which, in turn, relied on *Williams v. Poulos*, 11 F.3d 271 (1st Cir. 1993). In *Poulos*, the First Circuit determined that the "device" at issue in that case did not constitute telephone equipment within the meaning of Title III's business telephone exception because the device consisted of primitive "alligator clips attached to a microphone cable at one end" and an "interface connecting a microphone cable to a VCR and video camera," mounted on a plywood board on the other end. *See Poulos*, 11 F.3d at 280. The First Circuit determined that this unusual, make-shift device, which intercepted and recorded conversations, did not constitute telephone equipment within the meaning of Title III's business telephone exception. *See id.*

In *Sanders*, the Fourth Circuit held that a voice logger connected to the telephone system which continuously recorded all telephone conversations on designated lines did not constitute telephone equipment withing the meaning of Title

III. *Sanders*, 38 F.3d at 740-42. It is difficult to distinguish *Saunders'* facts. As the dissenting opinion in *Sanders* strongly maintained, this voice logger should have met the first prong of the business extension exception, i.e., "furnished to the subscriber or user by a provider of wire or electronic communications service in the ordinary course of its business." *Sanders*, 38 F.3d at 744-47 (citing *James v. Newspaper Agency Corp.*, 591 F.2d 579 (10th Cir. 1979); *Briggs v. American Air Filter Co. Inc.*, 630 F.2d 414 (5th Cir. 1980); *Epps v. St. Mary's Hosp. Of Athens, Inc.*, 802 F.2d 412 (11th Cir. 1986)). Indeed, the dissenting opinion stated that the equipment used in *Epps* "was indistinguishable from that used" in *Sanders*. 38 F.3d at 745. Clearly, there is a split in the Circuits on what may qualify for the first prong of the business extension exception.

The law in the Eleventh Circuit, however, is well-settled that if the communication is "intercepted" by a device being furnished and used in the ordinary course of business, such an interception does not violate Title III. *See also Royal Health*, 924 F.2d at 215; *Epps*, 802 F.2d at 416.

Unlike the situation in *Poulos*, here, the "interceptions" were made possible by the telephone extensions connected to the mainframe console, as part of the telephone system furnished to Best Marketing by Global Communications, Inc., a communications services company, in the ordinary course of its business.

Penney also contends that the recordings did not meet the second prong of the business extension exception because they were not made in the ordinary course of

41

business. He argues that because there was no policy of recording calls at Best Marketing, and because Penney and Dudley did not know that their calls were being recorded, the tapes cannot qualify for the second prong. He implicitly argues that the telephone extension exception contains a knowledge or consent requirement (Br. at 30).

In the Eleventh Circuit, the business extension exception does not contain a notice or consent requirement. In *Epps*, the recorded conversations fell within the telephone extension exception, even though the hospital did not have a policy of recording employee to employee calls and the employees who were making disparaging remarks about a supervisor were not aware that their conversation was being recorded. *Epps*, 802 F.2d at 416. In addition, even though the conversation at issue in *Epps* revealed the employees' personal opinions about their supervisor, this Court found the conversation sufficiently business-related because the conversations did not involve personal calls, occurred during office hours, between co-workers and concerned remarks about supervisory employees, thereby implicating business issues of employee relations. *Epps*, 802 F.2d at 417.

Penney also argues that because Hexter is deceased and because the district court would not allow full disclosure of all Hexter's attorney-client conversations with attorney Fields, it is impossible to determine his business reasons for recording employee conversations (Br. at 28). However, David Hexter's, Goldberg's, and Martin's testimony all indicated that Hexter intercepted telephone calls to train and

42

supervise employees and to suggest modifications to sales pitches. While Penney rejects this testimony out of hand and argues that if Hexter truly wanted to maintain quality control as a business purpose, his managers should have been listening to the telephone calls, the district court made a factual finding that Hexter's business purpose was quality control (R2:165). Absent clear error, this Court should not disturb the district court's finding. *United States v. Zapata*, 139 F.3d 1355, 1357 (11th Cir. 1998). The dissenting opinion in *Epps* focused on a "busybody" employee who took it upon herself to record other employees' personal conversations about a supervisor. *Epps*, 802 F.2d at 417-18. The dissenting judge would have found that the monitoring did not advance a legitimate business purpose and, therefore, should not have qualified for the business extension exception. *Id.* Here, however, Hexter was running a telemarketing business that he apparently thought was inside the telemarketing and wire fraud laws. That he failed to do so would not mean that his legitimate business purpose of attempting to do so also failed.

The district court did not abuse its discretion in refusing to suppress Hexter's recorded conversations between customers or potential customers of Best Marketing and Penney, concerning issues relating to the business of Best Marketing. These were indeed interceptions made in the "ordinary course of business" and fell under the business extension exception.

**III.    The District Court Did Not Abuse Its Discretion In Limiting The Testimony Of Edward Hexter And Best Marketing Inc.'s Attorney.**

Penney argues that he was not allowed to present his defense of good faith reliance on advice of counsel because the district court limited the testimony of attorney Sam Fields, private counsel for Edward Hexter and Best Marketing Inc. (Br. at 37). Penney cannot argue that he relied in good faith on attorney Field's advice because Field's was never his attorney.

Prior to trial Penney moved to subpoena various defense witnesses, including attorney Fields (DE:89). Apparently Penney further filed an *Ex-parte* Motion for Ruling on Preliminary Question of Attorney-Client Privilege which the government did not receive. Attorney Fields filed a response under seal which he subsequently shared with the United States (DE:128). Attorney Fields asserted the attorney-client privilege with Hexter and sought to have Penny's questions submitted to him prior to trial so he could determine privilege question by question. This apparently was never done.

Goldberg testified that while he saw attorney Fields visit with Hexter from time to time, it was Hexter who told the employees that Fields was supposed to keep Best out of trouble (R8:58). David Hexter testified that while he knew Fields had reviewed one of the fronter's pitches, he did not know if Fields "approved" it as "legal," and generally did not remember much about Fields' review of pitches (R16:147-48). David Hexter denied knowing if Fields had been given tape recordings of what the reloaders were saying (R16:162).

44

Attorney Fields appeared as a defense-called witness (R17:68-117). Prior to his testimony, Fields asserted the attorney-client privilege as to his advice to Edward Hexter and Best Marketing Inc. (R17:68-69). The district court held a sidebar discussion about what his testimony would cover and during that sidebar, Penney conceded that "Advice is privileged" (R17:74). In fact, Penney went so far as to assure the district court:

> I am not going to ask him questions about privileged information. I am not going to ask him about what Ed Hexter said to him and I am not going to ask him what he said to Ed Hexter.

(R17:76).

When Penney had difficulty expressing exactly what it was that he wanted to prove through Fields' testimony, the district court turned directly to the witness and held the following dialogue:

> THE COURT: Mr. Fields, on occasion, sir, did you during your representation of Best Marketing, meet with employees of the business and provide advice or statements as to what they could or could not do.

This relates to persons other than Ed Hexter.

\* \* \*

> ATTORNEY FIELDS: I want to be real clear. I don't have – God, I hate to use that phrase, but I certainly have no recollection of ever being in a meeting of which they were privileged at that meeting and I certainly have no recollection, nor any records that I was retained by any of them for that kind of advice.

45

> I was Mr. Hexter's lawyer. I was Best Marketing's lawyer. I never had a group meeting where I gave everybody general advice kind of thing. Nothing like that ever occurred, if that answers your question.

(R17:79-80).

On cross-examination, the government re-established the fact that Fields never

spoke with Penney or Dudley:

> PROSECUTOR: Mr. Fields, you said you represented Best Marketing. Does that mean, in effect, that you represented Ed Hexter?

> ATTORNEY FIELDS: I am not sure. That is kind of a legal question. I also was Mr. Hexter's personal lawyer on some occasions, but Best Marketing's lawyer, I am not sure if that is the same as saying I was also Mr. Hexter's for purposes of Best Marketing.

> PROSECUTOR: You did not represent Roby Dudley or Hannibal Penney, did you?

> ATTORNEY FIELDS: I was never retained to represent them.

> PROSECUTOR: And is it accurate to say that you did not engage in group meetings at Best Marketing where you gave Roby Dudley and Hannibal Penney advice?

> ATTORNEY FIELDS: I have no recollection of ever doing anything like that.

> PROSECUTOR: Was all the advice let me put it another way. Is your recollection that there were no group meetings at Best Marketing where you handed out legal advice on Best Marketing to all the employees?

> ATTORNEY FIELDS: I have no recollection of anything like that ever occurring.

(R17:108-09).

46

Moreover, on redirect examination of Fields, the district court gave Penney permission to question the attorney about the Best Marketing scripts, but Penney continued to question Fields about other litigation and the district court finally sustained an objection based on hearsay and repetition (R17:113).

Penney objects to not having had the opportunity to establish an alleged defense of "good faith reliance on advice of counsel" (Br. at 39). Penney's problem, which the district court repeatedly tried to point out to him, was that attorney Fields was never Penney's counsel. Penney does not even allege that Fields was his attorney; he simply wants to extrapolate the advice he surmises Fields gave to Hexter and maintain that he relied on it. There is no way Penney can legally rely on advice that was never given to him.

Penney cites *United States v. Eisenstein*, 731 F.2d 1540 (11th Cir. 1984), in support of his position that he should have been able to question Fields about the privileged discussions between Fields and Hexter. *Eisenstein* allows a defendant, charged with violating the money reporting statute, to assert a good faith reliance on advice of counsel. *Eisenstein*, 731 F.2d at 1543. In order to take advantage of this defense, the defendant must show that he relied in good faith after first making a full disclosure of all facts that were relevant to the advice for which he consulted the attorney. *Eisenstein*, 731 F.2d at 1543. This defense has recently been recognized

47

by this Court in *United States v. Petrie*, 302 F.3d 1280, 1287 (11th Cir. 2002). In

*Petrie*, the Court held:

> The evidentiary predicate for this defense is that the defendant "fully disclosed all material facts to his attorney" and "relied in good faith on the advice given by his attorney."

*Petrie,* 302 F.3d at 1287 (citations omitted).

Penney has never asserted that Fields was his attorney, much less that Penney fully disclosed to Fields how he was pitching sales from Best Marketing. Attorney Fields was clear that he had no recollection that he had ever spoken to the employees at Best Marketing. On this record, the district court did not abuse its discretion in limiting attorney Fields' testimony.

## Conclusion

For the foregoing reasons, the district court's decision should be affirmed.

Respectfully submitted,

Marcos Daniel Jiménez
United States Attorney

By:  Suzan Hill Ponzoli
Assistant United States Attorney

Anne R. Schultz
Chief, Appellate Division

Stephen Schlessinger
Assistant United States Attorney

Of Counsel

48

## Certificate of Compliance

I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B). This brief contains 11,809 words.

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing Brief for the United States was mailed this 24th day of March 2003, to William M. Norris, Esq., counsel for Hannibal Penney, 7685 S.W. 104th Street, Suite 220, Miami, FL, 33156 and further certify that on this 24th day of March 2003, an electronic brief was provided by uploading the foregoing Brief to the Court's Internet Web site at www.ca11.uscourts.gov.

Suzan Hill Ponzoli
Assistant United States Attorney

jc

49