# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**Thomas K. Kahn**
Clerk

In Replying Give Number
Of Case And Names of Parties

REC'D by _____ D.C.
APPEALS
SEP 2 3 2003
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

FILED by _____ D.C.
RECORDS
SEP 2 2 2003
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

September 18, 2003

Clarence Maddox
Clerk, U.S. District Court
301 N. Miami Avenue
Miami FL 33128

RE: 02-16050-II    USA v. Hannibal Penny
DC DKT NO.: 00-06270 CR-DLG

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:
Original Exhibits, consisting of: one folder, one envelope, one psi, one box — in Basement 2P
Original record on appeal or review, consisting of: eighteen volumes, six volumes supplemental

The district court clerk is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter and the judgment form, but not a copy of the court's opinion or Rule 36-1 decision, is also being mailed to counsel and pro se parties. A copy of the court's opinion or Rule 36-1 decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James Delaney (404) 335-6113

Encl.

1 brown binder of transcripts

3 brown ~~yellow~~ binder of pleadings

1 brown ~~binder~~ Accordion folder of pleadings

1 PSI

1 Sealed envelope

276

MDT-1 (8-2002)

# United States Court of Appeals
For the Eleventh Circuit

No. 02-16050

District Court Docket No.
00-06270-CR-DLG

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Aug 18, 2003

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

    Plaintiff-Appellee-
    Cross-Appellant,

versus

HANNIBAL PENNY,
a.k.a. Jim St. James,
a.k.a. Lincoln Green,
a.k.a. Grant Maxwell, Dr.,
a.k.a. St. James, Dr.,
    Defendant-Appellant-
    Cross-Appellee.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

---

Appeals from the United States District Court
for the Southern District of Florida

---

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
SEP 1 8 2003
U.S. COURT OF APPEALS
ATLANTA, GA.

Entered:    August 18, 2003
For the Court:    Thomas K. Kahn, Clerk
By:    Gilman, Nancy

**CORRECTED**

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

```
                              FILED
                        U.S. COURT OF APPEALS
                          ELEVENTH CIRCUIT
                           AUGUST 18, 2003
     No. 02-16050          THOMAS K. KAHN
 Non-Argument Calendar          CLERK
```

D. C. Docket No. 00-06270-CR-DLG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HANNIBAL PENNY,
a.k.a. Jim St. James,
a.k.a. Lincoln Green,
a.k.a. Grant Maxwell, Dr.,
a.k.a. St. James, Dr.,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Florida

(August 18, 2003)

Before ANDERSON, BIRCH and BLACK, Circuit Judges.



PER CURIAM:

Hannibal Penney appeals his conviction for six counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Penney presents three arguments on appeal: (1) the evidence at trial was insufficient to prove a violation § 1343; (2) the district court incorrectly applied the "Business Extension" exception in admitting the taped conversation of Penney's telephone conversations with the victims; and (3) the district court erred by prohibiting testimony of attorney Samuel Fields. For the following reasons, we AFFIRM.

A. Sufficiency of the Evidence

Penney worked for Best Marketing, Inc. ("BMI"), and made interstate telephone calls to customers to sell them business advertising products. Penney was convicted on six counts of wire fraud for participating in a scheme to defraud these customers because he falsely represented to the customers that they were going to receive high-value premiums, which were randomly selected, for placing a minimum order and that they were receiving large credits to their accounts, thus over-representing the value of the products that they were purchasing. He also falsely represented the quality of the items the customers were purchasing. Penney presents two arguments to the sufficiency of the evidence, which we will address in turn.

We review "the sufficiency of the evidence de novo, resolving all reasonable inferences from the evidence in favor of the jury's verdict." United States v. Woodruff, 296 F.3d 1041, 1045 (11th Cir. 2002), cert. denied, __ U.S. __, 123 S. Ct. 872 (2003).

The wire fraud statute, 18 U.S.C. § 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned . . . .

"The elements of a § 1343 wire fraud violation are: (1) intentional participation in a scheme to defraud; and (2) use of wire communications to further that scheme." United States v. Poirier, 321 F.3d 1024, 1028 (11th Cir. 2003). The wire communications must have taken place in interstate or foreign commerce. § 1343.

1. Interstate Nexus

Penney first argues that there was no proof of the interstate nexus required by § 1343 because there was no evidence of the victims' locations when Penney telephoned them. There is no direct evidence that the five telephone calls associated with Counts 12, 13, 14, 17, and 20 were interstate calls. Circumstantial

3

evidence may be used to establish the interstate commerce element. See <u>United States v. Hersh</u>, 297 F.3d 1233, 1254 n.31 (11th Cir. 2002), <u>cert. denied</u>, ___ U.S. ___, 123 S. Ct. 1319 (2003).

Although there is no direct evidence that the telephone calls were made interstate, there is sufficient circumstantial evidence for a jury to find that the interstate commerce element of the wire fraud statute was met with regard to all five counts. Charles Martin, a former BMI employee, testified that BMI salespeople only made sales calls out of state because they did not want Florida clients visiting the BMI office. R13-245 at 125. In relation to Count 12, Mike Carey was from Mount Pleasant, Michigan, owned two radio stations in Michigan and the name of his corporation was Central Michigan Communications. R15 at 4-5, 12, 17. With regard to Counts 13 and 19, Irving Amron testified that he owned a business in New Jersey, and that while he was there, he received calls from a salesman known as Dr. James St. James. R9-242 at 91-92. As to Count 14, Vickie Keel testified that she owned two businesses in Alabama, R11-243 at 109, and Penney confirmed her home address in Gadsden, Alabama, where he would send her confirmation letter. Gov't Exh. 14B at 9. Regarding Count 17, George Bayer testified that he owned a business in Sutton, Nebraska. R13-245 at 72-73. A questionnaire was sent by BMI to Bayer with a Central Nebraska and Florida

postmark. Id. at 79. Bayer faxed his confirmation letter to BMI from his job as office manager of a grain elevator in Sutton, Nebraska. Id. at 86. During Bayer's telephone conversation with Penney, Penney made reference to the fresh air in Nebraska, and Bayer said "[w]e got the good stuff here." Gov't Exh. 17B at 17. In relation to Count 20, Dr.Terry Nofziger testified that his medical practice was located in Paoli, Indiana. R14-244 at 24. During Nofziger's telephone conversation with Penney, Penney confirmed Nofziger's address in Indiana. Gov't Exh. 20B at 8-9. Accordingly, the government sufficiently proved the interstate element by circumstantial evidence for each count.

2. Intent to Defraud

Penney also argues that there was no proof of the intent to defraud because each victim entered into and understood the terms of the contract with BMI. He argues that each victim had the opportunity to confirm the allegedly fraudulent representation elsewhere. Penney made several misrepresentations to each of the victims to persuade them to make purchases, including which premiums were available, their value, and that they were randomly selected. Contrary to Penney's argument, these misrepresentations could not have been independently verified by the victims elsewhere. The evidence is sufficient to prove that Penney was involved in a scheme to defraud for each of the five counts.

With regard to Count 12, Penney told Carey that he was crediting $5,000 to his account, and that he was businessman of the year. Gov't Exh. 12B at 2. He told him that he was sending him 30 Mont Blanc pens for $1,499, and that Mont Blancs sold for between $150 and $250. Id. at 4, 6. He told Carey that BMI did business with AT & T and Pepsi. Id. at 7. Carey testified that, after six or eight months, "the tips of the pens [that he had bought from BMI] would fall off and the pens would fall apart." R15-247 at 6. He testified that they were not Mont Blanc pens. Id. at 18. As to Count 13, Penney told Amron that he was BMI's Chief Executive, Gov't Exh. 13B at 3, and that he was crediting Amron's account $2,000, id. at 6. He told Amron that he was guaranteed to receive a Rolex watch, a Chrysler car, a computer, or $5,000 in cash. Id. at 5-6. He further told Amron that the selection of premiums was done by computer, and that it was random. Id. at 30. He informed Amron that the $5,000 was the "bottom of the list," implying that it was the least valuable item on the list. Id. at 11. In fact, Amron received a gold watch with a leather band; it was a copy of a Movado with the name "Croton" on it. R9-242 at 100. Amron was disappointed with this watch, because he was expecting a Rolex. Id. Penney told Amron that he would be receiving Mont Blanc Ambassador pens, which were "executive item[s]" that sold for $150 to $250 each. Gov't Exh. 13B at 31. What Amron received was Mont Blanc-type pens, for

which he paid $25 each, but they were not real Mont Blanc pens. R9-242 at 107. Penney indicated to Amron that BMI had just closed a deal with AT&T, and that BMI did business with Quaker Oats and Pepsi. Gov't Exh. 13B at 17.

Regarding Count 14, Penney told Keel that he was crediting $1,000 to her account. Gov't Exh. 14B at 2. He informed her that she was businesswoman of the year. Id. at 7. As to Count 17, Penney told Bayer that he was the chief executive director of BMI, and that Bayer was businessman of the year for 1996. Gov't Exh. 17B at 7. He told Bayer that he was going to receive 40 24-karat gold Mont Blanc pens from Tiffany's for $1,998.50. Id. at 8-9, 13.

Although the government offered almost no testimonial evidence regarding Count 19, the tape and transcript of the telephone conversation between Penney and Amron that took place on 29 May 1996 were admitted into evidence and the jury considered it. R7-240 at 67. Amron gave no testimony regarding that conversation other than to acknowledge that he received the call and received a humanitarian award and a printer at that time. R9-242 at 100. However, the transcripted conversation involves Amron questioning Penney's "credit checks" with his GM credit card and Penney's assurances that if Amron were to complete the order, he would be rewarded with a car or "one of these outstanding pieces" in the near future. Gov't Exh. 19B at 2, 4-5. The transcript also reveals that Penney

implied to Amron that he was "crediting" his account for several thousand dollars. Id. at 12.

In relation to Count 20, Penney told Nofziger that he was the chief executive director of BMI, and that Nofziger had been BMI's businessman of the year. Gov't Exh. 20B at 2-3. He told Nofziger that it was official that he would receive a car, and that BMI intended to get the car into his possession within ten days. Id. at 3. Nofziger testified that he purchased the Mont Blanc pens, but did not receive a car. R14-244 at 28. The confirmation letter Nofziger received stated that the premiums given away were randomly selected by computer. Id. at 30. Nofziger stated that, after three purchases from BMI, he believed that, as he had been told on the telephone by Penney, "the car was going to be in [his] driveway in ten days." Id. Nofziger testified that he did not believe that the pens he received were Mont Blanc pens, and that there was nothing identifying them as such. Id. at 31. He stated that he continued to buy from BMI because he believed that he would receive a significant premium because that was what he had been told. Id. at 32.

Martin testified that premiums were never randomly selected by computer, and that the salespeople selected the premiums to be received by the customers. R13-245 at 114, 134, 136. Between 12 April 1996, and 12 July 1996, there were

more than 34 businessman or businesswoman of the year awards given by BMI. Id. at 148-51. Penney was not the chief executive officer of BMI, and in fact, held no other position at BMI other than salesman. R14-248 at 56. BMI did not have a board of directors. Id. BMI did not have large clients such as AT&T, Quaker Oats, Pepsi-Cola, or Chrysler. Id. at 79. BMI never gave out real Mont Blanc pens. R15-247 at 63. David Hexter testified that Penney could not credit a customer's account for $2,000 or for $90,000. R16-248 at 161. He testified that there were no random computer selections of premiums at BMI, and that any statement to that effect to a customer was false. Id. at 166-67.

In United States v. Thayer, we held that there was sufficient evidence to convict a defendant where the defendant was a "closer" in a telemarketing scheme, and was "instrumental in persuading victims to send their money by following a fraudulent script and making false representations." 204 F.3d 1352, 1357 (11th Cir. 2000) (per curiam). Penney's various statements were false and misleading, with the apparent intent to induce customers to purchase items that were not what he represented them to be. Contrary to Penney's argument, these misrepresentations could not have been independently verified by the victims elsewhere. The evidence was sufficient to prove that Penney was involved in a scheme to defraud.



B. The Business Extension Exception

Second, Penney argues that the district court incorrectly applied the "Business Extension" exception of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522, in admitting the taped conversations Penney had with the victims. He argues that the recording system, the Call Logger, was not telephone equipment for purposes of the exception, and that there was no legitimate purpose for the Call Logger. Regarding a motion to suppress, we review a district court's factual findings for clear error and its legal conclusions de novo. United States v. Anderton, 136 F.3d 747, 749 (11th Cir. 1998) (per curiam).

Title 18, United States Code, section 2515 prohibits the use as evidence of intercepted wire or oral communications and provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

Section 2510(4) defines the term "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any

electronic, mechanical, or other device." Section 2510(5) defines "electronic, mechanical, or other device" as

> any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than–
>   (a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business; or (ii) being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties;
>   . . .

These provisions constitute the "business extension exception," which excludes from the definition of interception calls that are intercepted by telephone equipment in the ordinary course of business. Epps v. St. Mary's Hosp. of Athens, Inc., 802 F.2d 412, 415 (11th Cir. 1986).

The district court concluded that Penney's calls were intercepted by telephone equipment in the ordinary course of BMI's business. In arguing that the Call Logger actually intercepted the calls, Penney contends that, if one digs deeply enough into any telephone system, one will find telephone company equipment. He argues that this results in the language of § 2510(5) being "surplusage." We disagree.

11

In Epps, we held that the hospital's dispatch console, and not the recording equipment, intercepted telephone calls for purposes of Title III. 802 F.2d at 415. Similarly, Charles Eckland, the owner of Global Communications ("Global"), testified at the suppression hearing that Global set up and maintained a Mytel SX-50 telephone system at BMI. R4-142 at 18, 26. BMI ordered telephone lines from the phone company, which were plugged into that system, or console. Id. at 21. The console would answer calls and transfer them to various extensions around the office. Id. As part of BMI's phone system, Global set up a service observation, by which telephone extensions could be monitored. Id. at 18. The service observation unit was not manufactured by any service provider. Id. at 27. Eckland testified that such units are part of a common practice in businesses. Id. at 18. He stated that "[a]ny business owner would want to know what his people were saying." Id. at 22. Global did not install or monitor the tape recorder used with the telephone system. Id. at 27-28. Jeffrey Porter, a former employee of Global, testified that, after he left Global, he installed for BMI owner Ed Hexter a Call Logger recording device, which could record up to 20 lines simultaneously. Id. at 38-39. He also testified that Ed Hexter said that he did not want people, especially his employees, to know that he was recording their calls. Id. at 53.

As in Epps, the Call Logger did not intercept the BMI salespeople's calls. Ed Hexter was able to monitor his employees' calls through use of the service observation set up by Global. The recording equipment was not part of the system set up by Global, but was set up by Porter for Ed Hexter. The definition of "intercept" in § 2510(4) does not include the recording of communications. Similar to Epps, calls could be monitored by use of the service observation. The district court found:

> the device used to intercept the conversations was . . . the mainframe console, or rather, the telephone extensions connected to the mainframe console. As the testimony of Eckland and Porter indicates, the service observation unit and the Call Logger were each connected to telephone extensions that ran from the mainframe telephone system. Thus, it was the telephone extensions that made possible the interceptions of telephone conversations between Best Marketing employees and others, and not the Call Logger.

R2-165 at 9. The district court's findings were consistent with the testimony of Eckland and Porter and our opinion in Epps.

In addition, Penney argues that the business extension exception is not applicable because there was no legitimate business purpose for making the recordings. The district court found that the recorded calls were made in the ordinary course of the business of BMI. Id. at 12. While Penney argues that the recording of the calls was not part of the ordinary course of business, § 2515

13

describes only the interception of calls. Consistent with Epps, we need only examine whether the interception of the calls was pursuant to a business purpose. In Epps, we held that the recorded calls, which "occurred during office hours, between co-employees, over a specialized extension which connected the principal office to a substation, and concerned scurrilous remarks about supervisory employees in their capacities as supervisors" were of legal interest to the employer and fell within the business extension exception. 802 F.2d at 417. Here, the calls also occurred during business hours, were between employees and customers or potential customers, were over office business extensions, and concerned BMI sales. Based on the above evidence, the district court did not clearly err in finding that the interception of Penney's calls was within the ordinary course of business.

C. Attorney Fields's Testimony

Last, Penney argues that the district court erred in prohibiting the testimony of BMI attorney Samuel Fields regarding his review of the sales scripts used by Penney. He argues that the testimony of Fields was critical to his case. He contends that Ed Hexter used Fields "as a protective garment," and that, if Ed Hexter was "knowingly engaged in his own fraudulent conduct," Fields should have been permitted to testify. Brief of Appellant at 39. He asserts that David Hexter testified that Fields previously stated that BMI was operating legally.

We review evidentiary rulings of the district court "for a clear abuse of discretion." United States v. Delgado, 321 F.3d 1338, 1347 (11th Cir. 2003). Penney provides no supporting authority that the district court abused its discretion in prohibiting Fields's testimony regarding his review of BMI's sales scripts. "The evidentiary predicate for [the defense of good faith reliance on the advice of counsel] is that the defendant 'fully disclosed all material facts to his attorney' and 'relied in good faith on the advice given by his attorney.'" United States v. Petrie, 302 F.3d 1280, 1287 (11th Cir. 2002) (quoting United States v. Condon, 132 F.3d 653, 656 (11th Cir. 1998)), corrected on other grounds, 2003 WL 21211926 (11th. Cir.) (per curam), cert. denied, ___ U.S. ___, 123 S.Ct. 1775 (2003). Penney never asserted that he disclosed the content of his "pitches" to Fields, or that Fields was his attorney; therefore, Penney cannot satisfy the evidentiary predicate for this defense. Absent this defense, the testimony of Fields regarding his review of the sales pitches used by BMI salespeople is irrelevant to the issue of Penney's guilt. Thus, Penney failed to show that the district court abused its discretion by prohibiting the testimony of Fields regarding his review of BMI sales scripts.

Upon review of the pleadings, the suppression hearing and trial transcripts, and upon consideration of the parties' briefs, we find no reversible error. We

conclude that there was sufficient evidence to convict Penney of all counts. The district court correctly applied the business extension exception to the admissibility of Penney's recorded telephone conversations. The district court did not err in prohibiting the testimony of Fields regarding his review of BMI salespeoples' scripts, finding that the information was covered by the attorney-client privilege.

**AFFIRMED.**

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia